R. David FINZER, Father, et al., Appellants,

v.

Marion S. BARRY, Jr., Mayor, District of Columbia, et al.

No. 84–5327.

United States Court of Appeals, District of Columbia Circuit.

Argued March 20, 1985.

Decided Aug. 19, 1986.

As Amended Sept. 9, 1986.

Raymond D. Battocchi, with whom Alfred F. Belcoure, James A. Bensfield and Steven F. Korostoff, Washington, D.C., were on brief, for appellants.

William J. Earl, Asst. Corp. Counsel for Dist. of Col., with whom John H. Suda, Principal Deputy Corp. Counsel for Dist. of Col. and Charles L. Reischel, Deputy Corp. Counsel for Dist. of Col., Washington, D.C., were on brief, for appellees.

R. Craig Lawrence, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., and Royce C. Lamberth, Asst. U.S. Atty., were on brief, for U.S., Washington, D.C., amicus curiae urging affirmance.

Before WALD, Chief Judge, BORK, Circuit Judge, and DAVIS,* Circuit Judge, United States Court of Appeals for the Federal Circuit.

Opinion for the Court filed by Circuit Judge BORK.

Dissenting opinion filed by Chief Judge WALD.

BORK, Circuit Judge:

Appellants are individuals who wish to carry placards opposing the policies of the Soviet and Nicaraguan governments in front of those governments' embassies, located within the District of Columbia. In the absence of a permit, such protests are barred by D.C.Code § 22–1115 (1981). That same statute authorizes police to disperse congregations in front of embassies. Appellants asserted unsuccessfully before the district court that, on its face, this law violates the first and fourteenth amendments to the Constitution. They appeal the district court's holding that the statute is constitutional and its grant of summary judgment for defendants.

The challenged statute regulates demonstrations taking place in front of foreign embassies (or buildings occupied by representatives of foreign governments) located within the District of Columbia. It contains several subsidiary provisions but for purposes of exposition it is sufficient to note its two primary features. The first makes it unlawful to "display any ... placard ... designed ... to ... bring into public odium any foreign government ... or to bring into public disrepute political, social, or economic acts, views, or purposes of any foreign government" within 500 feet of that country's embassy, unless the demonstrators receive a permit to do so from the Chief of Police. The second feature makes it unlawful to "congregate within five hundred feet of any [embassy], and refuse to disperse after having been ordered so to do by the police authorities" of the District of Columbia.[1]

Speaking very generally, the first part of the statute—requiring a permit for the display of a sign tending to bring a foreign government into disrepute—is primarily intended to avoid affronts to the dignity of foreign governments and their diplomatic personnel. The second feature—prohibiting "congregating"—is concerned more with threats to the security of the foreign government's representatives and property. Each of these main divisions of the statute is, of course, capable of serving both purposes mentioned. In both cases, the protection is limited to an area extend-

---

* Sitting by designation pursuant to 28 U.S.C. § 291(a).

1. The full text of D.C.Code § 22–1115 (1981) reads as follows:

 It shall be unlawful to display any flag, banner, placard, or device designed or adapted to intimidate, coerce, or bring into public odium any foreign government, party, or organization, or any officer or officers thereof, or to bring into public disrepute political, social, or economic acts, views, or purposes of any foreign government, party, or organization, or to intimidate, coerce, harass, or bring into public disrepute any officer or officers or diplomatic or consular representatives of any foreign government, or to interfere with the free and safe pursuit of the duties of any diplomatic or consular representatives of any foreign government, within five hundred feet of any building or premises within the District of Columbia used or occupied by any foreign government or its representative or representatives as an embassy, legation, consulate, or for other official purposes, except by, and in accordance with, a permit issued by the Chief of Police of the said District; or to congregate within five hundred feet of any such building or premises, and refuse to disperse after having been ordered so to do by the police authorities of the said District.

ing 500 feet from the building. In *Frend v. United States,* 100 F.2d 691 (D.C.Cir. 1938), *cert. denied,* 306 U.S. 640, 59 S.Ct. 488, 83 L.Ed. 1040 (1939), this court rejected a first amendment challenge to section 22–1115 and upheld the provision's constitutionality. In issuing the judgment we review today, the district court, relying in part on *Frend,* reached the same conclusion. *Finzer v. Barry,* Civ. Action No. 84–0899 (D.D.C. May 17, 1984), Record Excerpts ("R.E.") at 62.

Our opinion is, unfortunately, quite lengthy, because in addition to presenting our analysis, it is necessary that we address the numerous and varied challenges to this statute advanced by appellants and the dissent. We hold that section 22–1115 passes constitutional muster, and we affirm the district court's holding to that effect. We remand, however, for the limited purpose of addressing appellants' claim that section 22–1115 has been enforced by local authorities against persons who were not in fact engaged in activities forbidden by the statute.

I.

Father R. David Finzer is the National Chairman of the Young Conservative Alliance of America, Inc., which he describes as "an organization of younger citizens who hold conservative views, and are dedicated to advocating and furthering those viewpoints." Declaration of Father R. David Finzer, R.E. at 15. He and three co-plaintiffs—Bridget Brooker, J. Michael Waller, and Michael Boos—initiated this action in March of 1984 against the District of Columbia, the Mayor, and the Chief of Police. The United States was granted leave to participate as *amicus curiae* and supported the constitutionality of the statute.

Plaintiffs' complaint and accompanying declarations state that they wish to conduct demonstrations of the sort described in D.C.Code § 22–1115—they wish to carry signs critical of the Soviet and Nicaraguan governments within 500 feet of their embassies. Mr. Waller, for example, wishes to carry a sign bearing the words "Stop the Killing" in front of the Nicaraguan Embassy. Two of the plaintiffs claim to have been prevented in the past from demonstrating by uniformed police officers acting under the authority of section 22–1115. Additionally, they allege that the statute has been enforced against activity that was not in fact within its reach. Arguing that section 22–1115 abridges rights guaranteed by the first and fourteenth amendments to the United States Constitution, plaintiffs moved for summary judgment, seeking a permanent injunction against the provision's enforcement and a declaration of its unconstitutionality.

Defendants opposed this motion and filed a cross motion for summary judgment. They filed accompanying declarations from David Fields, Deputy Assistant Secretary of State for Security; Thomas D. Quinn, Special Agent in Charge of the Office of Protective Operations of the United States Secret Service; James E. Nolan, Jr., Director of the Office of Foreign Missions, Department of State; and John C. Connor, Deputy Chief of Police and Commanding Officer of the Special Operations Division of the Metropolitan Police Department in the District of Columbia. The declarations of the two State Department officials noted that the responsibility of a host state to provide appropriate protection to foreign embassies within its borders is one codified and imposed by international law, and that the degree of protection afforded by foreign governments to American diplomatic personnel abroad depends in significant part upon the protection provided by our government to foreign diplomats living in Washington, D.C. It was the considered judgment of both men that diminishing the protection provided by section 22–1115 would have a serious and adverse effect upon the relationships between the United States and many other governments and would endanger American diplomatic personnel who live and work in other countries. The other two declarants stated, on the basis of their professional experience, that section 22–1115 was necessary to the

continued security of foreign embassies located in Washington, D.C. They explained that the task of protecting foreign embassies presented unique security problems, because—unlike, for example, when protecting the White House, the Capitol, or the Supreme Court—American police are prohibited from entering the premises. They may do so only upon the express prior approval of the foreign government, which, for obvious reasons, will rarely be given. The 500 foot buffer zone created by section 22–1115 compensates to some degree for the absence of any American police presence inside these buildings. R.E. at 36–58.

The plaintiffs did not submit any declarations in response. Instead, they filed a Statement of Material Facts in Dispute in which they claimed that they were entitled to summary judgment even if all the defendants' declarations were accepted as true, and informed the district court that they did not wish to seek discovery at the time with respect to the factual contentions made in those declarations. R.E. at 59.

In a Memorandum Order issued on May 17, 1984, Judge Gasch granted defendants' motion for summary judgment. He held section 22–1115 to be "necessary for the protection of the personnel and property of foreign governments located in Washington, D.C." *Finzer v. Barry*, Civ.Action No. 84–0899, mem. op. at 3, R.E. at 64. He found that the statute served to fulfill American obligations under international law and to protect our representatives abroad, noting that "[f]ew government interests are more compelling." *Id.* Judge Gasch held therefore that the statute withstood the scrutiny required by the equal protection clause and relied upon the authority of *Frend* in rejecting the first amendment challenges.

## II.

The appellants in *Frend v. United States* had been convicted of violating section 22–1115 by demonstrating in front of the Aus-

trian and German embassies. Finding that there was no question that their activities ran afoul of the statute, the *Frend* court proceeded to examine the statute's constitutionality.

The court noted that section 22–1115 was enacted as an exercise of Congress' constitutionally vested authority to "define and punish ... Offenses against the Law of Nations," U.S. Const. art 1, § 8, cl. 10, its purpose being to fulfill the United States' duty under international law "of protecting the residence of an ambassador or minister against invasion as well as against any other act tending to disturb the peace or dignity of the mission or of the member of a mission." 100 F.2d at 692, 693. Limited as the statute was to "public demonstrations calculated to arouse passions and resentments in those governments with which we have official relations," this court held that section 22–1115 was a legitimate and constitutional exercise of congressional authority. *Id.* at 693.

Although *Frend* is persuasive precedent, we cannot decide this case simply by citing it as the binding law of the circuit. The case was decided almost a half century ago and in the interval the Supreme Court has developed constitutional law in ways that must be taken into account. Appellants challenge section 22–1115 in part on the basis of a hybrid of equal protection and first amendment law that became part of the doctrinal landscape several decades after *Frend*. Indeed, much of modern first amendment law took shape after *Frend* was decided. We are compelled, therefore, to reexamine *Frend* in light of intervening precedent. Upon review, we find much of its analysis still convincing, and the basic holding fully consistent with the constitutional standards that have evolved.[2]

## III.

■ Though it will be necessary in the course of this opinion to meet the multiple charges levelled by appellants and by the

---

2. We note that the same conclusion has recently been reached by the Superior Court of the District of Columbia, which upheld § 22–1115 against precisely the same challenges presented here. *United States v. Brown*, No. M–10901–83 (D.C.Super.Ct. Jan. 20, 1984).

dissent upon this minor regulation of demonstrations, the core of this case lies in the relationship between the United States' national interests and international obligations and the first amendment's guarantee of free speech. The question to be determined is whether section 22–1115 achieves a permissible accommodation between the competing claims of these profound constitutional values.

### A.

■ Section 22–1115 was enacted pursuant to Congress' power, under article I, section 8 of the Constitution, "To define and punish ... Offenses against the Law of Nations." The need for such authority was, of course, one of the reasons a new constitution was desired, and the power was placed among the great powers granted the new government. Implementation of the law of nations by the American government was seen as crucial to the conduct of our foreign relations, a subject of pervasive concern in the Constitution. For that reason, the statute before us, though rooted in Congress' power to define and punish offenses against the law of nations, also draws sustenance from all those provisions of articles I and II that empower the national government, as a whole, to manage American intercourse with other nations.

In vesting Congress with the power to define, as well as to punish, offenses against the Law of Nations, article I, section 8 of the Constitution authorized Congress to derive from the often broadly phrased principles of international law a more precise code, as it determined that to be necessary to bring the United States into compliance with rules governing the international community. In enacting section 22–1115, Congress sought to guarantee to foreign diplomats, long understood as "objects of especial respect and protection," [3] the security to which they have always been entitled under legal doctrines

accepted and enforced throughout the world. Since the days of Blackstone, "infringement of the rights of ambassadors" have been regarded as one of "the principal offenses against the law of nations." 4 W. Blackstone, *Commentaries* 68, and for as long as the United States has been a nation, those rights have been recognized to include those that are implicated here—protection from intimidation and the potential of violence, and from assaults on the dignity and peace of the embassy as well.

■ The principle that host states have a special responsibility to ensure that foreign embassies and the personnel inside them are free from threats of violence and intimidation is "solidly entrenched in the Law of Nations." 2 C. Hyde, *International Law* 1249 (1945). Vattel, one of the first to attempt to codify the Law of Nations, wrote in the eighteenth century that embassies

> being of such great importance in the universal society of nations, and so necessary to their common well-being, the persons of ministers charged with those embassies are to be held *sacred* and *inviolable* among all nations.... This safety is particularly due to the minister, from the sovereign to whom he is sent. To admit a minister, to acknowledge him in such character, is engaging to grant him the most particular protection, and that he shall enjoy all possible safety. It is true, indeed, that the sovereign is bound to protect every person within his dominions, whether native or foreign, and to shelter him from violence: but this attention is in a higher degree due to a foreign minister.

Vattel, *The Law of Nations* 464–65 (1863) (emphasis in original). Vattel went on to note that while an act of violence done to a "private person" was an "ordinary transgression," which the sovereign of the country in which it occurred was free to pardon, a similar act against a foreign ambassador was "a crime of state, an offence against

---

**3.** President Fillmore, Message to Congress, Dec. 2, 1851, 6 J. Moore, *International Law Digest* 813 (1906).

the law of nations," of which the power to pardon was vested in the sovereign "who has been offended in the person of his representative." *Id.* at 465. The need for special measures to ensure protection is thus a function of both the unique sensitivity of the position and the strength of feeling that may often be aroused against nations which, while perhaps in some respects adversarial to ours, are ones with which we need to maintain diplomatic channels of communication.

The duty to safeguard the peace and dignity of the embassy has equally strong roots. Vattel explained:

> The respect which is due to sovereigns should redound to their representatives, and especially their ambassadors, as representing their master's person in the first degree. Whoever offends and insults a public minister commits a crime the more deserving of severe punishment, as he might thereby involve his country and his sovereign in very severe difficulties and trouble.

Vattel, *supra,* at 463. Thus, the tearing down in Philadelphia in 1802 of the flag of the Spanish minister, "with the most aggravating insults," was considered actionable in the Pennsylvania courts as a violation of the law of nations. 4 J. Moore, *Digest of International Law* 627 (1906) (*quoting* letter from Secretary of State Madison to Governor McKean (May 11, 1802)). A complaint by the British government in 1794 concerning a "riot committed by a number of persons tumultuously assembled before the house of a foreign consul, requiring him to deliver up certain persons supposed to be resident with him, and insulting him with improper language," was determined not to be subject to prosecution in the United States only because a consul was not considered a public minister. 1 Op. Att'y Gen. 41–42 (1794). Indeed, Attorney General William Brad-

ford, in 1794, published an opinion in which he noted that the law of libel, when applied "in the case of a foreign public minister, ... is strengthened by the law of nations, which secures the minister a peculiar protection, not only from violence, but also from insult." 1 Op. Att'y Gen. 52 (1794). *Accord* 1 Op. Att'y Gen. 73 (1794) ("it is usual [for foreign nations] to complain of insults to their ambassadors, and to require the parties to be brought to punishment"). The longstanding principle of diplomatic immunity reflects the same concern. One of the statutes enacted by the First Congress protected ambassadors from arrest and from suit. Any person who sought to prosecute or serve a writ upon an ambassador was subject to up to three years' imprisonment, as were his attorney and any official who sought to execute the writ. Act of Apr. 30, 1790, ch. 9, §§ 25–26, 1 Stat. 112, 117–18.[4]

It was assumed by the framers and ratifiers of the Constitution that our obligations under international law would be honored. In the course of their rebellion, the American colonies were quick to assure the world that the "law of nations [would be] strictly observed." 14 J. Cont.Cong. 635 (1779). The Continental Congress, lacking meaningful authority, had to content itself with passing a resolution urging the states to provide judicial remedies for infringements of the rights of ambassadors. 21 J.Cont.Cong. 1136–37 (1781). This resolution was apparently ineffective, for Edmund Randolph was later, at the constitutional convention, to identify as one of the defects of the Articles of Confederation that "they could not cause infractions of treaties or of the law of nations, to be punished," and to note as an example that "[i]f the rights of an ambassador are invaded by any citizen it is only in a few states that any laws exist to punish the offender." 1 M. Farrand, *The Records of the Federal*

---

**4.** The Act of State doctrine is a reflection of *judicial* adherence to a similar principle: courts will allow what may be an expropriation to take place rather than inquire into the representations made by a foreign government with respect to acts within its borders, in part out of a reluctance to "give offense," *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 432, 84 S.Ct. 923, 942, 11 L.Ed.2d 804 (1964), and in order to "avoid disrespect for foreign states." § 469 comment a *Restatement of Foreign Relations Law (Revised)* (Tent.Draft No. 7, 1986).

*Convention of 1787,* at 19, 25 (1911). In arguing for ratification, John Jay subsequently characterized it as "of high importance to the peace of America that she observe the law of nations." The Federalist No. 3, at 13 (P. Ford ed. 1898). *Accord* Dickinson, *The Law of Nations as Part of the National Law of the United States,* 101 U.Pa.L.Rev. 26, 55–56 (1952) ("the Constitution was framed in firm reliance upon the premise, frequently articulated, that ... the Law of Nations in all its aspects familiar to men of learning in the eighteenth century was accepted by the framers, expressly or implicitly, as a constituent part of the national law of the United States").

As we have demonstrated, the framers understood that the protection of foreign embassies from insult was one of the central obligations of the law of nations. *See supra,* pp. 1455–56. Indeed, the Act of April 30, 1790, which provided for the imprisonment of anyone who sought to bring legal action against an ambassador, *see supra* p. 1456, was enacted by a Congress that consisted of many of the framers of the Constitution, along with their contemporaries. That Act flatly denied access to the courts, which is a form of petitioning the government, and yet was assumed to be constitutional. As the Supreme Court has shown, it is often instructive to examine the practices at the time of the Constitution's framing as a guide to understanding the meaning of its provisions. *See Marsh v. Chambers,* 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983).

These were among the considerations that motivated the Congress that enacted section 22–1115. These principles were repeatedly invoked during the debate on the Senate floor. Senator Pittman, the sponsor of this provision, commented:

> I believe that since the beginning of government the inviolability of ambassadors and ministers has been universally recognized in all civilized countries. Even in times of vicious wars special ambassadors from one of the hostile countries to the other have gone without

guards, realizing that the honor of the country to which they were going was sufficient to protect their lives and to protect them in the performance of their duties. If this were not so, intercourse between governments would be practically impossible.

81 Cong.Rec. 8587 (1937). The issue of the law's constitutionality was the subject of some discussion, and Senator Pittman argued strenuously that there was no constitutional right to do that which was regulated by the statute:

> —to make an offensive demonstration in front of an embassy or in front of a legation, the residence of a diplomat, who is our guest here, who depends on us wholly for his protection not only against murder, not only against insult, but against any character of annoyance or interference that will bring the hatred of the people of his country against our people.

*Id.* at 8589.

The requirements imposed by international law have changed somewhat since the days of Vattel, since the founding of the Republic, and even since the era in which section 22–1115 was enacted. The legal principles embodied in section 22–1115, however, have gained rather than lost force in the intervening years. Article 22 of the 1961 Vienna Convention on Diplomatic Relations, to which the United States is a signatory, sets out duties expected of a host state in regard to the mission premises of foreign nations. It states:

> 1. The premises of the mission shall be inviolable. The agents of the receiving State may not enter them, except with the consent of the head of the mission.

> 2. *The receiving State is under a special duty to take all appropriate steps to protect the premises of the mission against any intrusion or damage and to prevent any disturbance of the peace of the mission or impairment of its dignity.*

3. The premises of the mission, their furnishings and other property thereon and the means of transport of the mission shall be immune from search, requisition, attachment or execution.

*Basic Documents in International Law* 219 (Ian Brownlie ed. 1983) (emphasis added). The principles embodied in the Vienna Convention were for the most part already established under customary international law. According to Leonard Meeker, who as Legal Adviser to the State Department testified in favor of Senate ratification, "[t]he 1961 Vienna Conference examined the articles in the light of modern conditions, surveying the body of law and practice which had developed over the years regarding the rights, duties, and privileges of diplomatic missions" and "recognized the great need for an agreed international standard of treatment." *Hearing on the Vienna Convention on Diplomatic Relations Before the Subcomm. of the Senate Comm. on Foreign Relations,* 89th Cong., 1st Sess. 2 (1965).

Article 22 of the Vienna Convention was derived from draft article 20, which was adopted in 1958 by the International Law Commission. In its commentary on this provision, the Commission stated that the receiving state bore a "special duty," and that it "must, in order to fulfill this obligation, take special measures—over and above those it takes to discharge its general duty of ensuring order." II *Yearbook of the International Law Commission 1958* at 78, 95. The Department of State has cited section 22–1115 as the concrete implementation by the United States of its legal obligations under paragraph two of article 22 of the Vienna Convention. *Hearing on the Vienna Convention on Diplomatic Relations Before the Subcomm. of the Senate Comm. on Foreign Relations, supra,* at 49.[5]

We think it clear beyond quibble that since the founding of our nation adherence to the law of nations, and most particularly that branch of the law that demands security for the persons and respect for the dignity and peace of foreign emissaries, has been regarded as a fundamental and compelling national interest. It is also clear that the founders, who explicitly gave Congress the power to enforce adherence to the standards of the law of nations, which they understood well, saw no incompatibility between this national interest and any guaranteed individual freedom.

### B.

It must not be forgotten that a determination by the political branches concerning the obligations of the United States is also a determination about the conduct of American foreign policy. Defining and enforcing the United States' obligations under international law require the making of extremely sensitive policy decisions, decisions which will inevitably color our relationships with other nations. Such decisions "are delicate, complex, and involve large elements of prophecy. They are and should be undertaken only by those directly

**5.** As we have indicated, Article 22 of the Vienna Convention created no new law, but rather codified doctrine that already existed. In similar fashion, the Harvard Draft Convention on Diplomatic Privileges and Immunities, published in 1932, provided that:

A receiving state shall protect the premises occupied or used by a mission, or occupied by a member of a mission, against any invasion or other act tending to disturb the peace or dignity of the mission or of the members of a mission....

26 Am.J.Int'l L. 20–21 (Supp.1932). According to the commentary accompanying the Convention:

Protection against invasion of the premises of a mission ... means protection against any attempt to enter the premises against the will of the chief or other members of the mission. The duty, however, goes further than that. The receiving state is under a duty to protect the premises against any acts tending to interfere with the enjoyment or possession of such premises.... The special duty of protection of premises would include protection against crowds or mobs collected in the vicinity of the premises for the purpose of expressing abuse, contempt or even disapprobation of the sending state or of its mission, or of the members of a mission. A similar duty would seem to exist to protect such premises against so-called "picketing," this being an act tending to disturb the peace and dignity of the mission. *Id.* at 56–57.

responsible to the people whose welfare they advance or imperil. They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility . . . ." *Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp.*, 333 U.S. 103, 111, 68 S.Ct. 431, 436, 92 L.Ed. 568 (1948).

A number of judicial doctrines embody the "classical deference [owed by courts] to the political branches in matters of foreign policy." *Regan v. Wald*, 468 U.S. 222, 242, 104 S.Ct. 3026, 3039, 82 L.Ed.2d 171 (1984). For example, the Act of State doctrine, *see supra* note 4, "concerns the competency of dissimilar institutions to make and implement particular kinds of decisions in the area of international relations," and derives from the "strong sense" that an absence of judicial restraint in that area "may hinder rather than further this country's pursuit of goals both for itself and for the community of nations as a whole in the international sphere." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 423, 84 S.Ct. 923, 937, 11 L.Ed.2d 804 (1964). The political question doctrine requires that courts abstain from cases where there "is found a textually demonstrable constitutional commitment of the issue to a coordinate political department," *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962), foreign affairs exemplifying perhaps the most prominent such commitment. *See Goldwater v. Carter*, 444 U.S. 996, 1002–06, 100 S.Ct. 533, 536–39, 62 L.Ed.2d 428 (1979) (Rehnquist, J., joined by Burger, C.J., and Stewart and Stevens, JJ., concurring in the judgment). Similarly, the Court has repeatedly characterized immigration policy, "interwoven with . . . the conduct of foreign relations," *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89, 72 S.Ct 512, 518–19, 96 L.Ed. 586 (1952), as "largely immune from judicial control." *Fiallo v. Bell*, 430 U.S. 787, 792, 97 S.Ct. 1473, 1477, 52 L.Ed.2d 50 (1977) (*quoting Shaughnessy v. Mezei*, 345 U.S. 206, 210, 73 S.Ct. 625, 628, 97 L.Ed. 956 (1953)). These lines of

doctrine are unified by the recognition that there are certain classes of decisions which courts are institutionally less suited to make.[6]

Deference to the judgment of Congress and the President in these matters is, of course, by no means absolute. But this is not a case in which we are asked to believe any implausible thing. It is obvious that ill treatment of ambassadors to the United States will adversely affect the interests of the United States. It is also obvious that the protection accorded those ambassadors by section 22–1115 is a limited one and regulates speech to a very minimal extent. Strictly speaking, it may be doubted whether there is any need for any particular deference to the judgment of the political branches in order to uphold this statute. But if there is such a need, it is amply met.

We have here an unusually strong case for judicial deference, over and above the traditional and general requirement of restraint in the area of foreign relations, for we are asked to review a statute which both Congress and successive Presidents have declared to be necessary to fulfill our obligations under both customary international law and a treaty which we have signed. It has long been understood that the interpretation given by the executive branch of the country's responsibilities under the treaties to which it is a signatory are entitled to "great weight." *See Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 184–85, 102 S.Ct. 2374, 2379–80, 72 L.Ed.2d 765 (1982); *Kolovrat v. Oregon*, 366 U.S. 187, 194, 81 S.Ct. 922, 926, 6 L.Ed.2d 218 (1961). This necessarily shapes the nature of the scrutiny to which we subject the justifications offered for section 22–1115, for in this context a court cannot lightly dispute a determination by the political branches that the statute meets important international obligations, that the interests at stake are compelling,

6. Contrary to the suggestion made by the dissent, dissent at 1484 n. 8, first amendment cases are no exception to this principle. *See Kleindienst v. Mandel*, 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972).

or that those interests cannot be met by a statute with a more narrow reach. When a provision is enacted in order to bring the United States into compliance with international law, and when those obligations are reaffirmed by treaty, a court must give careful consideration before it sets aside that which the legislative and executive branches have deemed necessary to fulfill the nation's international responsibilities. It would be quite improper for the judiciary to disregard international obligations that are inseparable from our nationhood.

### C.

■ We accept, as highly pertinent to the compelling interests served by section 22–1115, the uncontradicted assertions made in the government affidavits, which describe the sensitive foreign policy concerns the statute implicates. Contrary to the suggestion made by the dissent, we do not uphold the statute "simply because the government has sent its lawyers into court to defend it." Dissent at 1489. The presence of a first amendment claim requires that the court examine the balance struck by the political branches. The deference we owe is not to the government's *legal* judgment that the statute is constitutional, but to their factual discussion of the nature and depth of the foreign relations interests that are involved. (As we have said, with or without such deference, it is obvious that these interests are genuinely present.) Once we accept that these interests exist, it becomes the responsibility of the court to determine whether they justify the statute before us.

■ The four uncontradicted declarations submitted by defendants below indicate some of the special concerns justifying the unique measures imposed by section 22–1115.[7] The two State Department officials cite the Vienna Convention as the source of the international obligation honored by the statute. Declaration of James E. Nolan, Jr., R.E. at 46; Declaration of David Fields, R.E. at 36–37. The Vienna Convention, as we have explained, codified both the responsibility to provide security to foreign embassies and the responsibility to protect them from affront. The affidavits do not explain, nor need they, that it constitutes an affront to display a sign that characterizes members of a government as, for example, "killers." Expert judgment is hardly necessary on such a point. What the affidavits provide is a detailed description of the special difficulties associated with ensuring the security of foreign embassies, and the consequences of failing to do so.

Both David Fields—the State Department official responsible for coordinating security arrangements for diplomatic personnel in the District—and James Nolan—Director of the Office of Foreign Missions—attested to the existence of a direct relationship between the perception held by other governments of the strength of security provided their diplomats here and the extent of protection they choose to provide ours. In Nolan's words, "[t]o compromise on the security provided to foreign missions here is to compromise on the security of our personnel in our missions overseas. What happens in terms of security provided to foreign diplomatic personnel and premises here has a direct impact on the protection afforded U.S. missions and personnel abroad." Declaration of James E. Nolan, Jr. at 2, R.E. at 47. *Accord* Declaration of David Fields at 2, R.E. at 37.

---

7. Appellants claim that the district court's reliance on the assertions contained in these declarations was improper and in the event their argument that the statute is facially unconstitutional is rejected, they urge that we remand the case so that the assertions can be contested at trial. Appellants misconceive the responsibility of a party opposing a motion for summary judgment. The mere mention to the district court that plaintiffs "vigorously dispute" statements made in declarations, R.E. at 60, without any supporting citations to the record, *see* Local Rule 1–9(i), will not serve to call into question the contentions made by the opposing parties. *See* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.").

These concerns were very much in the mind of Congress when it enacted section 22–1115. Senator Pittman explained that "the motive that actuates us today is to have the foreigners upon whom we must depend for the protection of our citizens friendly to us." 81 Cong.Rec. 8485 (1937). This was echoed by Cordell Hull, then Secretary of State, who urged passage of the statute in a letter to Senator Pittman: "Unless we extend such reasonable protection to representatives of other governments, we cannot hope to receive protection for our representatives abroad." *Id.* at 8486. Foreign governments may not all be expected to preserve the same equanimity in the face of hostile demonstrations that we require of domestic government. Moreover, foreign governments, not being subject to United States law, particularly constitutional law, as American officials are, have ways of retaliating against American interests and Americans, whether official representatives or private citizens, abroad.

As the declarations of the Secret Service agent who heads the Office of Protective Operations, Thomas Quinn, and the Commanding Officer of the Special Operations Division of the Metropolitan Police Department, Deputy Chief of Police John Connor, reveal, there are unique obstacles to providing adequate security to foreign embassies—the most significant of which is the inability of police personnel to establish a presence inside the buildings. The Quinn declaration is worth quoting at length:

> 2. In many respects the obstacles confronting the Secret Service in providing security for foreign embassies, legations and consulates are much greater than those encountered in protecting personnel and property of the United States. At the White House and at the residence of the Vice President, for example, the Secret Service maintains a presence inside the structures which enables it to deploy a defensive network consisting of a number of manned perimeter posts radiating out from a centralized command center. The Secret Service's permanent on-site presence has also facilitated the installation of sophisticated surveillance equipment which enables Secret Service personnel to continuously monitor the area between the building and the fence which surrounds the site. Although the task of insuring the safety of the White House complex and the residence of the Vice President is extremely difficult, it would be impossible were the Secret Service subject to the same legal constraints that control Secret Service operations at foreign embassies, consulates, and legations.

> 3. The structures which house the diplomatic operations of foreign nations provide a tangible focal point to those wishing to demonstrate against the policies of the foreign government. Recent events underscore the fact that demonstrations near embassies or other official foreign government buildings, even if initially peaceful, exacerbate tensions and often lead to violent confrontations between the police and demonstrators. However, in contrast to the White House and other official buildings of the United States, Secret Service personnel are prohibited by international law and comity from entering onto the premises of a foreign embassy, legation, or consulate except with the expressed prior approval of the foreign government. Consequently, at such locations, the Secret Service has no centrally located defensive command center, has a minimal amount of intrusion detection equipment at its disposal, and, perhaps most important, has no secondary or fall-back defensive position which would otherwise be available if the Secret Service were permitted to position personnel inside the protected premises.

Declaration of Thomas D. Quinn at 2–3, R.E. at 42–43. The 500–foot buffer therefore provides "a necessary zone for police response in those instances when the perimeter is breached." Declaration of John C. Connor at 2, R.E. at 49.[8]

---

**8.** The Fields Declaration cites an incident that illustrates the importance of this buffer:

#### D.

It has long been understood that the right to demonstrate may be made to depend in part on the site of the protest. The Supreme Court has upheld the constitutionality of laws regulating protests in front of a courthouse on the basis of the State's "legitimate interest in protecting its judicial system from the pressures which picketing near a courthouse might create." *Cox v. Louisiana*, 379 U.S. 559, 562, 85 S.Ct. 476, 479, 13 L.Ed.2d 487 (1965). It has upheld the application of a general trespass statute to demonstrations at jails, jails having been "built for security purposes." *Adderley v. Florida*, 385 U.S. 39, 41, 87 S.Ct. 242, 244, 17 L.Ed.2d 149 (1966). It has upheld the exclusion of political candidates from military bases, the function of military bases being "to train soldiers" rather than host political events. *Greer v. Spock*, 424 U.S. 828, 838, 96 S.Ct. 1211, 1217, 47 L.Ed.2d 505 (1976). And it has upheld the regulation of expressive activity near a school when such activity might disturb the educational activities inside. *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Each of these cases makes clear that the nature and extent of first amendment rights may vary with the location at which their exercise is sought.

Appellants offer extensive analogies to prior cases involving protests in front of the White House, the Capitol, and the Supreme Court, but the regulations in those cases simply did not implicate the same set of interests addressed by section 22–1115. First, shielding government officials from public protest is incompatible with our democratic structure, which relies on public criticism as a means of promoting responsive government. Foreign ambassadors, in contrast, have no similar obligation to be accessible to public attack, and our polity does not have the same interest in ensuring that they are. Second, we cannot ignore the fact that American diplomats living overseas are always to some degree at risk. The perception abroad that our government is diminishing the protection accorded the embassies to whom we are host would, we are told, seriously compound that risk. Finally, and most fundamentally, we face here a question of living up to our obligations under international law and a treaty. These considerations distinguish the issues presented here from those involving protests in front of the White House, the Capitol, and the Supreme Court.

Section 22–1115, then, is a statute supported by a compelling governmental interest and one which imposes only a very minor geographic limitation on speech. It is impossible for us to see how the compelling interest at stake could be served with a regulation that had any significantly smaller impact on speech.

■ The statute that Congress has crafted proscribes an opposition demonstration only within a narrowly defined locus. Plaintiffs are free under section 22–1115 to hold an anti-Soviet demonstration anywhere in the city but within 500 feet of the Soviet Embassy. Appellants presumably feel that the embassy location would generate heightened visibility and best help them succeed in getting their message across. But the first amendment does not guarantee an optimal setting for speech; there is no right to the backdrop most interesting to press photographers or television cameramen. *See Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640, 647, 101 S.Ct. 2559, 2563, 69

---

Another example of this problem occurred recently in connection with a demonstration near the Soviet Embassy here by a group of Afghans protesting the Soviet invasion of Afghanistan. The demonstrators broke through police lines, but due to the 500–foot distance separating them from the Embassy premises, police were able to re-establish control, making a number of arrests in the process, before the demonstrators could reach the building.

Had the distance separating the demonstrators from the Embassy been less, the results probably would have been quite different, and property damage and personal injury to the embassy and its occupants might well have resulted, with potentially serious consequences for U.S. foreign relations and the security of U.S. personnel overseas. Declaration of David Fields at 3–4, R.E. at 38–39.

L.Ed.2d 298 (1981); *Adderley v. Florida,* 385 U.S. at 47–48, 87 S.Ct. at 247–48; *White House Vigil for the ERA Committee v. Clark,* 746 F.2d 1518 at 1520, 1538 (D.C.Cir.1984). Inevitably, many of the most desirable places to demonstrate will be buildings and areas that for other reasons require special protective measures. We think Congress has met an unusually difficult problem with a balanced attempt to restrict no more speech than necessary.[9]

The obligations of the United States under international law, reaffirmed by treaty, do not, of course, supersede the first amendment. Neither, however, has it ever been suggested that the first amendment is incompatible with the United States' most basic obligations under the law of nations. The two must be accommodated and section 22–1115 accomplishes an accommodation well within the range of the permissible. That may be seen by imagining a shift of the balance in either direction. Were we to hold that the first amendment requires Congress to allow protests and demonstrations up to the gate of an embassy, there would be very little left of the United States' international obligation to preserve the peace, dignity, and security of foreign representatives in our nation's capital. Peace and dignity would be destroyed outright, while, as a practical matter, the task of repulsing invasions of the embassy and its grounds would be left largely to the foreign nation's security forces. Violence

between American citizens and foreign security forces in Washington, D.C., is hardly calculated to improve relations between governments or to be thought by the international community to be an adequate discharge of America's international obligations. If, on the other hand, Congress tried to protect foreign representatives from all affronts, it would have to rule off limits all utterances anywhere tending to bring foreign governments into disrepute. That, of course, is unthinkable. The first amendment would have been destroyed over wide areas in the name of international law. What has been done through section 22–1115 is to give first amendment freedoms the widest scope possible consistent with the law of nations. Appellants, and all other Americans, may freely express their sentiments about the actions of the Soviet Union and Nicaragua on radio and television, in print, by speech or placard, and they may do so anywhere in the United States, but they may not carry the described placard or congregate within 500 feet of the embassy of the nation concerned. To regard that trifling limitation, enacted under a power explicitly given by the Constitution, as a threat to freedom of speech seems to us a considerable exaggeration.

### E.

The dissenting opinion offers a number of objections to our analysis. At this point

9. Appellants suggest that the existence of 18 U.S.C. § 112(b) (1982) demonstrates that Congress could have achieved the same ends with a narrower statute. 18 U.S.C. § 112(b) regulates demonstrations near embassies and other buildings owned by foreign governments *outside* the District of Columbia, and is somewhat less restrictive than § 22–1115 of the D.C.Code. The unstated premise of this argument, however, is that the governmental interests at stake in these two statutes are indistinguishable. In fact, the same Congress that enacted § 112(b) in its present form—amending a more restrictive version than had been enacted some years before—left § 22–1115 alone. There are several plausible reasons why Congress might choose to differentiate between the two. The greater concentration of embassies in the District of Columbia, and the special visibility of the capital, may well make enhanced protection necessary. In addition, Congress relies to some extent on the

state and local governments to provide whatever additional measures are necessary to protect foreign nationals, aware perhaps that security needs may differ from state to state. *See Concerned Jewish Youth v. McGuire,* 621 F.2d 471, 475 (2d Cir.1980) (18 U.S.C. § 112(b) did not set "maximum standards of protection," and left open possibility of local authorities using "stricter controls"). Therefore, the fact that Congress generally exercises much more direct and specific authority over municipal activities in the District of Columbia than those in other cities may well explain the differences between the measures adopted in the two statutes. We note in this regard that the authority of the United States Secret Service over matters involving the protection of foreign embassies is substantially greater for those embassies located within the District than for those located outside. 3 U.S.C. § 202 (1982).

we undertake to respond to the related arguments that the statute serves no compelling governmental interest, that it is both overinclusive and underinclusive, and that it is unconstitutional because there is a less restrictive alternative available. We think that these arguments are not only defective but that, in an important respect, the first and the third contradict one another.

The dissent regards the interest in maintaining our nation's adherence to longstanding principles of international law as not compelling. In the dissent's view, that interest is so far from compelling that, aside from providing an initial source of authority for the congressional enactment, the law of nations does not bear at all on the question of that enactment's constitutionality. This line of attack requires the dissent to trivialize the compelling national interests that are reflected in international law. When these interests are given their appropriate weight, however, the dissent's constitutional argument—which is premised on its utter rejection of those interests—is revealed as beside the point.

The dissent's analysis appears to rest on the assumption that this court must either hold that international law "supersede[s]" constitutional requirements (as we are charged with doing, dissent at 1482), or conclude that international law is irrelevant and conduct the analysis as if no principle of international law were present (as the dissent does). Both propositions would be incorrect.

If international law were, as the dissent views it, just another code of rules, like the common law of negligence or statutory law governing commercial transactions, it would of course offer little that need be weighed against a constitutional provision. As a matter of formal description, leaving aside the real interests in play, it is true that in the American legal hierarchy, the Constitution trumps all other law. But it is also true, as the dissent systematically overlooks, that other law sometimes expresses values and concerns that are of legitimate constitutional dimension. In such cases, the assertion that the Constitution cannot be overridden by ordinary law is true but analytically empty. As we have tried to make clear, international law in the aspect dealt with here is important not in the merely formal sense just described but because it embodies American interests that are themselves given weight in the Constitution and that must, for that reason, find accommodation with the first amendment. Those interests have to do with the place of the United States among nations, with the respect it is accorded, with the raising or lowering of tensions between our country and others, with the conduct of our foreign policy, primarily by the President but also in some measure by Congress in ways specified by the Constitution, and, in extreme cases, with war and peace. When, in the considered judgment of the branches charged by the Constitution with the responsibility for these matters, a minor regulation of picketing is necessary to preserve the peace and dignity of foreign emissaries, it is preposterous to say that no interest is present that courts need to respect and weigh.

While the dissent appears to concede that "the nature of an embassy and our responsibilities as international hosts do weigh in the balance as to what is permissible regulation of free speech in that particular place," dissent at 1483, it chooses to ignore completely the definitions given those responsibilities by Congress, the President, and codified and customary international law in favor of its own. One reads the dissent's analysis of the dignity interest in vain for a hint that any such responsibilities are involved here. Dissent at 1485–87. The dissent rejects this interest on the basis of a generalization—people ought not be shielded from speech they find distasteful—that has never been applied in this context, as if the context were irrelevant. Any "weighing" the dissent has done is invisible. We think the founders would have been quite surprised to learn that the document in which they constituted the government precludes the enactment of a statute to honor one of the core

principles of the law of nations because that interest is not "compelling."

The dissent also employs an all-or-nothing theory of compelling governmental interests to argue, so far as one can tell, that the United States must either abandon any attempt to protect the peace and dignity of foreign embassies or impose nationwide censorship over all modes of expression that might conceivably insult any foreign government. Dissent at 1481–82. The dissent notes that the government has never sought to ban all conceivable affronts to foreign governments, and concludes from this that America's international obligation is "flexible," *id.* at 1485, thus not compelling, and hence, in effect, constitutionally non-existent. Going to the other extreme, the dissent wonders how, if section 22–1115 is supported by a compelling governmental interest, the ban can be so limited. The dissent implies that our analysis would support a nationwide suppression of any criticism of foreign governments, which the dissent finds "worrisome." *Id.* at 1487. The Vienna Convention specifically requires protection of *embassy premises*, not of foreign sensibilities about what is printed in American newspapers. But that fact aside, the dissent's is a startling mode of constitutional analysis: faced with a spectrum between competing constitutional values, a court must override one value completely and take the other to its extreme. A court faced with the competing constitutional demands of fair trials and press freedom could resolve the issue, apparently, only by prohibiting any press reports of any criminal proceedings or by throwing the entire process open, even to the extent of allowing television cameras into the deliberations of the grand and petit juries. Either result would be absurd. We can uphold, for example, a decibel limit applied to soundtrucks without fear that the same rationale—preserving the public peace—would equally well support the silencing of all speech everywhere. The everyday business of judging is the exercise of judgment, of balance, of accommodation, not the announcement that no value may be admitted into the calculus which, if carried to its extreme and applied without regard to competing values, would produce an unacceptable result.

The dissent challenges also our holding that the statute is sufficiently tailored, and concludes that the regulation is both overinclusive and underinclusive. However, its discussion measures the statute only against the interest in security, having eliminated the interest in peace and dignity from the analysis. Since we have shown that this second interest is valid as well, we need express no judgment on whether the security interest, standing alone, would be sufficient to justify the constitutionality of section 22–1115.

■ The dissent argues in addition, however, that even if the statute were adequately tailored it would be unconstitutional because there exists a less restrictive alternative: a statute barring *all* demonstrations within five hundred feet of an embassy. It seems somewhat odd to describe an alternative that restricts more speech as "less restrictive." While there certainly is more involved in the examination of alternatives than simply "comparing the number of syllables that are uttered" under each, dissent at 1493, an alternative statute that restricts *every* exercise of expression regulated by the statute before us *and* other, presently unregulated, speech activities as well, is not (whatever other virtues it may possess) a less restrictive alternative.[10]

---

**10.** The dissent is correct when it points out that "the 'greater' power does not necessarily include the lesser." Dissent at 1492. Therefore, the fact that a broad, content-neutral prohibition would be constitutional does not, by itself, imply that all less broad, content-based statutes are *necessarily* constitutional too. In *Police Department of the City of Chicago v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972), *Grayned v.* *Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972), and *Carey v. Brown,* 447 U.S. 455, 461–62, 100 S.Ct. 2286, 2290–91, 65 L.Ed.2d 263 (1980), the mere fact that total antipicketing laws might be constitutional did not justify laws that permitted some picketing but not others on the basis of content. In those cases, however, the statutes were infirm not because there was a constitutionally acceptable content-neutral alter-

The dissent takes an unwarranted step when it concludes that section 22–1115 is unconstitutional because a broader time, place, or manner regulation would be constitutionally acceptable and would accomplish the same ends. While Congress is free to enact such a statute, it need not do so.[11] Under the dissent's theory, the law upheld in *Cox v. Louisiana*, which prohibited picketing near a courthouse "with the intent of influencing any judge, juror, witness, or court officer," ought to have been struck down because the local government was free to ban *all* picketing near a courthouse. The law in *Young v. American Mini Theatres*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310, which forbade adult theatres from locating within 1,000 feet of other adult theatres, ought to have been invalidated because such a restriction could lawfully have been applied, and therefore could *only* lawfully have been applied, to *all* theatres. The dissent's position requires as well that we regard the unpublished order issued by a panel of this court (Judges Wright, Leventhal and Robb) in *Jackalone v. Andrus*, No. 79–2359 (D.C. Cir. Nov. 19, 1979), as wrong. In *Jackalone*, we "accept[ed] the representation of the State Department that a demonstration at Lafayette Park has an unacceptable potential for danger to the hostages now being held in the American Embassy in Tehran," and upheld its prohibition. *Id.* While that order, being unpublished, is not

precedent, we think it instructive to note that the dissent's analysis would have required that the prohibition on demonstrations relating to the Iranian situation that was upheld in the order be voided, with the government allowed to choose only between permitting the demonstration or banning all demonstrations in that area.[12]

The dissent's analysis thus reads a grave threat to liberty in every statutory distinction related to the purpose of the statute, and inexorably leads to a requirement of a total ban within the proscribed area. This would present a new element in first amendment jurisprudence—a "most restrictive alternative" doctrine. The cure suggested is far broader than the problem. One supposes that Father Finzer, if he won his case on such a ground, might reasonably consider his victory Pyrrhic. Nothing is solved by such a "solution."

The dissent's assertion that it would be constitutional to prohibit *all* demonstrations near embassies—an assertion necessary to its claim that the present statute is unconstitutional because there exists a "less restrictive" alternative—undercuts another key premise of its argument because it cannot be squared with the dissent's rejection of any valid interest in protecting the peace and dignity of embassies. As the dissent agrees, a law prohibiting a lone protester carrying a sign of any sort bears no relation to safeguarding the phys-

---

native, but because the distinctions embodied in the statutes were not narrowly tailored to serve compelling government interests.

11. The dissent's heavy reliance on *Schacht v. United States*, 398 U.S. 58, 90 S.Ct. 1555, 26 L.Ed.2d 44 (1970), is misplaced. The viewpoint-discrimination in *Schacht* did not serve *any* legitimate governmental interest. It appears from the decision that the government did not claim otherwise, and chose to defend its position on other grounds.

12. The dissent need not be troubled by our citation of this unpublished order. The Circuit Rule only forbids citing such orders "as precedent," *Western Union Telegraph Co. v. FCC*, 773 F.2d 375, 377 n. 1 (D.C.Cir.1985), which we do not do. We mention *Jackalone* only because it serves to illustrate a realistic scenario in which the dissent's theory would require an incorrect result. While the regulation under which the

permit in *Jackalone* was denied is content-neutral, it is clear from the brief that the government's rationale for forbidding the demonstration by Iranian students in front of the Iranian embassy was that the demonstration was likely to attract hostile onlookers, and that news reports describing and televising Americans shouting obscenities at Iranian students in front of the embassy would have endangered American diplomatic personnel in Iran by angering the Iranian government. This judgment was made on the basis of the content and viewpoint of the demonstration, and on the nationality of the demonstrators. While this is an extreme example, the parallels to § 22–1115 are evident, since the dissent's requirement that neutral prohibitions be chosen over non-neutral ones is not affected by the strength of the governmental interest involved.

ical security of the building and its occupants. Dissent at 1488. The only conceivable interest that would support such a restriction of speech is that of dignity and peace. The dissent admits as much when it states that its proposed total ban "would provide greater protection from the dangers to both dignity and security than the current regulation does." Dissent at 1495. The dissent's endorsement of the constitutionality of such a statute is a recognition, therefore, that political speech near an embassy poses a special problem that is of constitutional magnitude, and that problem is the one the dissent elsewhere denigrates, the need to maintain the peace and dignity of foreign emissaries. The dissent thus necessarily concedes implicitly what it denies explicitly.

The dissent compounds its analytic difficulties by suggesting (without explanation) that this interest, while not "compelling," might be "significant" and that it therefore would justify a statute that is content-neutral but not one that is content-based. Dissent at 1496 n. 23. The dissent never reveals the process by which it calibrates these standards, so there is no way of knowing why the interest in honoring international obligations, and the foreign policy concerns implicated by those obligations, rise so far and no further. Certainly there is nothing in the dissent's analysis of the dignity interest that provides the answer. That discussion, as we have noted, approaches this interest by completely abstracting it from the international context in which it arises, and rejects our holding that it is compelling simply by noting that individuals may not be "shield[ed] ... from hearing things they find offensive," when that offensiveness is based "on the fact that the audience disagrees." *Id.* at 1485–86.

There are at least two answers to this truism. The first is that the proposition was designed for members of the American political community. They may not be shielded from speech with which they disagree because the competition of ideas is central to our democratic process. That rationale has nothing to do with giving

offense to a foreign ambassador. The dissent never addresses this point. It merely notes that public criticism of foreign governments may affect the domestic political debate. While the assertion is true, it does nothing to salvage the dissent's challenge to the interest in preserving the peace and dignity of the embassy, since that challenge is grounded in the principle that there is no legitimate interest in shielding listeners from speech they find offensive. The identity of the listener is relevant to the question of when this principle applies.

The second answer is that, were it applicable here, the proposition advanced would make it impossible to sustain the dissent's position. The interest in shielding people from political speech with which they disagree is neither compelling nor important nor legitimate, and cannot justify a statute enacted for that end even if, in order to make it more constitutionally palatable, the legislature bans favorable speech at the same time. If the serious and substantial foreign policy concerns we have described are not present, then a content-neutral statute passed in order to forestall critical speech (by banning all speech) would be unconstitutional. If, as we believe, and as the governmental branches entrusted with judgment on these matters have asserted, these concerns are in fact deeply implicated, they are quite clearly compelling.

## IV.

We turn now to the challenge presented by appellants, which is in some respects quite different from that made by the dissent. For obvious reasons, the appellants do not suggest that prohibiting their demonstration would be permissible as long as others are prohibited as well. While they urge upon us several distinct grounds for reversing the decision below, they too emphasize the issues of content and viewpoint discrimination. As we have explained, the first provision of the statute they seek to invalidate applies only to demonstrations in which signs are displayed that are designed

to bring a foreign government into "public odium" or "public disrepute." Their legal challenge relies heavily on this element of the statute as the root of its constitutional infirmity, raising claims grounded in the first amendment guarantees of free speech and assembly and the fourteenth amendment guarantee of equal protection.

Content-based restrictions have been held to raise both first and fourteenth amendment claims because in the course of regulating speech, they differentiate between types of speech. *Compare Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (exclusion of religious speech from public forum violates first amendment right of free speech) *with Police Department of the City of Chicago v. Mosley*, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) (exemption of labor picketing from ban on picketing near schools violates fourteenth amendment right of equal protection). Under either theory, such a statute is valid only if "necessary to serve a compelling state interest and ... narrowly drawn to achieve that end." *Perry Education Association v. Perry Local Educators' Association*, 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983); *accord Carey v. Brown*, 447 U.S. 455, 461–62, 100 S.Ct. 2286, 2290–91, 65 L.Ed.2d 263 (1980).

■ Appellants do not concede that this is the relevant test. Instead, they point to language in *Mosley*, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972), and *Regan v. Time*, 468 U.S. 641, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984), which might seem to suggest a total ban on content-based restrictions of any sort. Were appellants correct, first amendment law would have been revolutionized. The Court, it would have to be supposed, has overruled *subsilentio New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (heightened protection accorded writings about "public figures"), *Ginsberg v. New York*, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968) (upholding obscenity regulation), and *Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed.

1031 (1942) (upholding prohibition of use of "fighting words"), as well as a host of other decisions too numerous to mention here. No such upheaval has taken place. In *Mosley*, the Court invalidated a city ordinance that prohibited all picketing within one hundred and fifty feet of a school, except peaceful labor picketing of any school involved in a labor dispute. Although the opinion in *Mosley* contains *dicta* suggesting that content-based restrictions are "never permitted," 408 U.S. at 99, 92 S.Ct. at 2292, the Court in that case in fact conducted the traditional analysis and determined that the statute in question was not sufficiently tailored to its objectives. *Id.* at 100–101, 92 S.Ct. at 2292–93. Were content-based restrictions automatically unconstitutional, that discussion would have been unnecessary. In *Regan v. Time*, the Court found unconstitutional a statutory scheme which made it a crime to photograph securities or obligations of the United States unless "for philatelic, numismatic, educational, historical, or newsworthy purposes," 18 U.S.C. § 504 (1982), finding that a determination of newsworthiness or educational value was necessarily content-based. The government defendants, however, had declined to defend the constitutionality of the content-based regulation as written, arguing that the provision in question was not in fact mandatory. 468 U.S. at 649 n. 5, 104 S.Ct. at 3267. Although the majority opinion includes the assertion that "[r]egulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment," *id.* at 648–49, 104 S.Ct. at 3267 the absence of the traditional balancing analysis can likely be attributed to the refusal of the government to put forward any governmental interest served by the provision as written for the Court to balance. We note that in a case decided after *Regan*, this court declined to adopt the extreme view urged by appellants here and reaffirmed the continuing validity of the "narrowly tailored to compelling state interest" test. *White House Vigil for the ERA Commit-*

*tee v. Clark*, 746 F.2d 1518, 1526 n. 66 (D.C.Cir.1984).

Appellants argue alternatively that even if content-based restrictions are generally subject to a balancing test, section 22–1115 is not. They point out that this statute represents not only *content* discrimination, but *viewpoint* discrimination as well. While a prohibition of, for example, all political speech near an embassy would be a content-based restriction arguably subject to the standard described above, a prohibition of speech that brings a foreign government into disrepute is a viewpoint-based restriction that appellants contend is *per se* unconstitutional. They maintain that the fact that the statute is viewpoint-discriminatory, "standing alone," renders it invalid, Reply Brief for Plaintiffs-Appellants at 1–2. This is presumably why they characterized the declarations submitted below by defendants as "not relevant nor material to any issue involved in this case." Brief for Plaintiffs-Appellants at 58.

We do not think the law is more severe with respect to viewpoint-based restrictions than it is to content-based restrictions. Although some academic commentators have urged that there be different tests for those content-based restrictions that are viewpoint-neutral and those that are not,[13] the Supreme Court has maintained a uniform standard. *See Carey v. Brown*, 447 U.S. at 462 n. 6, 100 S.Ct. at 2291 n. 6. Indeed, the suggestion that a statute which is not viewpoint-neutral is automatically invalid was put to rest in *Parker v. Levy*, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974), which upheld the constitutionality of laws prohibiting members of the armed forces from making speeches which "bring discredit upon the armed forces," 10 U.S.C. § 934 (1982).[14]

Statutes that regulate speech in ways that affect different viewpoints differently may well be less likely to be upheld than statutes which affect all viewpoints equally, but that is simply because there are fewer situations that justify differentiation according to the speaker's viewpoint. The standard for justification remains the same.[15]

---

**13.** *See, e.g.,* Farber, *Content Regulation and the First Amendment: A Revisionist View,* 68 Geo. L.J. 727 (1980); Stephan, *The First Amendment and Content Discrimination,* 68 Va.L.Rev. 203 (1982); Stone, *Restrictions of Speech Because of its Content: The Peculiar Case of Subject-Matter Restrictions,* 46 U.Chi.L.Rev. 81 (1978).

**14.** Contrary to the suggestion made by the dissent, dissent at 1493 n. 18, we do not attribute "relevance to the Court's silence" in *Parker,* for the Court was not silent. In the course of rejecting the overbreadth challenge, the Court held that Levy's conduct—illegal because of the *content* of his public statements, 417 U.S. at 736–37, 739, 94 S.Ct. at 2552–53—was "unprotected under the most expansive notions of the First Amendment" and that the regulations at issue "may constitutionally prohibit" it. *Id.* at 761, 94 S.Ct. at 2564. The dissent correctly notes that the reasoning in *Parker* relies heavily on the military context of these regulations. We therefore do not regard *Parker* as dispositive in this case, except insofar as it demonstrates that the suggestion by appellants that all viewpoint distinctions are *per se* unconstitutional is unfounded—a suggestion about which the dissent is ambivalent. Dissent at 1494.

**15.** Under the most recent Supreme Court precedent, § 22–1115 may not in fact qualify as a content-based statute. In *City of Renton v. Play-*

*time Theatres, Inc.,* — U.S. —, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), the Court found constitutional a zoning ordinance that prohibits "adult" motion picture theatres from locating within one thousand feet of any residential zone, single- or multiple-family dwelling, church, park, or school. Writing for six members of the Court, Justice Rehnquist explained that while the ordinance "treats theatres that specialize in adult films differently from other kinds of theatres," it nevertheless was aimed not at the *content* of the films "but rather at the *secondary effects* of such theatres on the surrounding community." *Id.* at — U.S. at —, 106 S.Ct. at 929 (emphasis in original). It was thus "completely consistent with our definition of 'content-neutral' speech regulations as those that 'are *justified* without reference to the content of the regulated speech.'" *Id.* (quoting *Virginia Pharmacy Board v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976) (emphasis added in *City of Renton* )). Similarly, § 22–1115, while differentiating on the basis of the content of the speech, is justified by reference to content-neutral values—the need to adhere to principles of international law and to provide sufficient protection to foreign embassies. Because we are not entirely sure, from *City of Renton* alone, whether § 22–1115 is the sort of statute that can be analyzed under the standard applicable to

## V

We stated in Part III our holding that the interests which section 22–1115 was enacted to serve are indisputably compelling. Appellants have not seriously contested that point, although neither have they conceded it. Their argument is rather that regardless of the importance of the statute's ends, the means it establishes are unconstitutionally vague, standardless, facially overbroad, and discriminatory. We now take up each set of claims in turn.

### A.

█ The issue of vagueness requires no lengthy discussion. Whatever ambiguity may exist at the fringes, section 22–1115 applies clearly and directly to the activities in which the parties who brought this action wish to engage. The complaint they filed made precisely that admission: "[P]laintiffs wish peacefully to carry banners, placards, signs and devices which depict messages critical of foreign governments, and their acts and policies. They wish to do so on the public streets and sidewalks in the District of Columbia, within 500 feet of the official buildings of the foreign governments whose acts and policies they intend to criticize." Complaint at 3–4, R.E. at 6–7. There is no ambiguity, therefore, in the statute's application to the conduct primarily at issue. *See Young v. American Mini Theatres*, 427 U.S. 50, 58–59, 96 S.Ct. 2440, 2446–47, 49 L.Ed.2d 310 (1976) (holding it "unnecessary" to consider vagueness challenge to an ordinance "unquestionably applicable" to the parties before the Court).

Nor in any event is section 22–1115 unconstitutionally vague. With this statute, as with virtually all statutes, it is undoubtedly the case that a skilled legal "imagination can conjure up hypothetical cases in which the meaning of these terms will be in nice question." *American Communications Association v. Douds*, 339 U.S. 382,

412, 70 S.Ct. 674, 690, 94 L.Ed. 925 (1950). Nevertheless, its language is straightforward. As this court has previously observed, "[s]ection 22–1115 meticulously specifies the consequences against which it erects protection for foreign governments." *Zaimi v. United States*, 476 F.2d 511, 526 (D.C.Cir.1973). Both demonstrators and law enforcement officers are given a clear description of the activity the statute proscribes, and there is no reason to believe that a substantial amount of conduct outside its scope is being deterred. Section 22–1115 defines the offense "with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement," *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983), and that is all that is required.

### B.

█ Appellants challenge that portion of section 22–1115 which forbids congregating within five hundred feet of the official buildings after police authorities have ordered dispersal on the ground that the provision does not contains standards defining when such orders can be given. They cite only one case in support of this argument—*Shuttlesworth v. Birmingham*, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969). They assert that *Shuttlesworth* is "dispositive," because section 22–1115—like the statute struck down in *Shuttlesworth*—confers "absolute discretion" on city officials to prevent a public demonstration. Brief for Plaintiffs-Appellants at 53. The dissent agrees with this argument, and finds controlling our decision in *United States v. Abney*, 534 F.2d 984 (1976) (per curiam). We disagree; the statutes are more different than they are similar, and their differences are constitutionally relevant. The statute in *Shuttlesworth* governed all demonstrations taking place in the

content-neutral time, place and manner restrictions, and because we believe it meets the more stringent standard to which content-based restrictions have traditionally been held, we focus on that latter standard.

public streets of Birmingham. Demonstrators were required to obtain a permit from the city, which could be denied if the relevant commission determined "in its judgment [that] the public welfare, peace, safety, health, decency, good order, morals or convenience" so required. 394 U.S. at 149, 89 S.Ct. at 937. The regulation in *Abney* required anyone wishing to sleep, camp or loiter in Lafayette Park for more than four hours to obtain a permit from the Superintendent. The final clause of section 22-1115, in contrast, governs only the sensitive areas surrounding foreign embassies and other such official buildings. It establishes no permit procedure applicable to all demonstrations, but authorizes policemen who are on the scene to order dispersal.

We find unconvincing the dissent's argument that procedures requiring permits, such as those invalidated in *Shuttlesworth* and *Abney*, are constitutionally indistinguishable from the police discretion involved here. Police have always possessed authority to require people to move when a statute supplies the criteria that guide and confine police discretion. This court upheld two such statutes granting police discretion no broader than that given by section 22-1115 in *Washington Mobilization Committee v. Cullinane*, 566 F.2d 107 (D.C.Cir. 1977). Section 22-1121(2) of the District of Columbia Code, provides:

Whoever, with intent to provoke a breach of the peace, or under circumstances such that a breach of the peace may be occasioned thereby—....

(2) congregates with others on a public street and refuses to move on when ordered by the police;

shall be fined not more than $250 or imprisoned not more than ninety days, or both.

This statute requires the police to judge what constitutes a breach of the peace and what circumstances may lead to a breach of the peace, judgments of the same nature as those required by section 22-1115. Additionally, Article VI, § 5a of the District's police regulations, known as the Police Line Regulation, authorizes a police officer to clear an area of the size he considers "necessary" for a variety of purposes when fires, accidents, etc., or "other occasions cause or may cause" persons to collect. Every person "shall comply with any necessary order or instruction of any police officer." [16] This court, in reversing the district court's invalidation of the regulation as allowing "unfettered discretion," pointed out that it could not be known in advance what would be necessary on particular occasions so that "the regulation's definition of the scope of police discretion in functional terms is reasonable, and ... meticulous specificity is not required." 566 F.2d at 119.

■ The case before us is equally clear. The authority to disperse is given by a statute that has specific purposes. The authority may be exercised, therefore, only when the police reasonably believe that a threat to the security or peace of the embassy is present. The dissent would not suggest, we are confident, that a court would sustain a conviction *under this stat-*

---

**16.** The pertinent text of the Police Line Regulation is as follows:

Sec. 5a. When fires, accidents, wrecks, explosions, parades, or other occasions cause or may cause persons to collect on the public streets, alleys, highways, or parkings, the Chief of Police, inspector, captain of police, or officer acting for him, may establish such area or zone as he considers necessary for the purpose of affording a clearing for: (1) the operation of firemen or policemen; (2) the passage of a parade; (3) the movement of traffic; (4) the exclusion of the public from the vicinity of a riot, disorderly gathering, accident, wreck, explosion, or other emergency; and (5) the protec-

tion of persons and property. Every person present at the scene of such an occasion, shall comply with any necessary order or instruction of any police officer. No person shall enter such area or zone, unless duly authorized by the person in command on such an occasion; Provided, That bona fide representatives of the press and bona fide insurance adjusters or underwriters and such other persons as the Chief of Police may authorize to be within such space, and who shall have plainly exposed to view the press pass or fire pass described in this section, shall be permitted within the lines established by the Police Department under the conditions named in the following paragraph....

*ute* for refusal to disperse upon a policeman's order if the policeman had acted out of personal malice, to prevent the sidewalk sale of neckties, or in order to interrupt what he suspected to be a conversation contemplating the sale of drugs. It is not a question of requiring proof of an "abuse of power" before voiding this provision. Dissent at 1499. We do not believe the provision grants police the power to disperse for reasons having nothing to do with the nearby embassy. In a word, the purposes of the statute supply the necessary criteria just as much as a "breach of the peace" ordinance does. The dissent refers to this as a "narrowing" construction, dissent at 1497, but we think it is simply the most plausible construction, one following the unexceptional principle that statutes are construed in light of the purposes behind their enactment. The dissent insists upon giving the statute the most expansive construction conceivable, one unrelated to the legislative purpose. We can see no reason for doing so, aside from the fact that it is easier to attack the inflated version. The discretion given by section 22–1115, being cabined by the statute's purposes, is no broader than essential and is, therefore, constitutionally permissible.[17]

### C.

Appellants next contend that the statute is overbroad, and sufficiently so to require facial invalidation. The overbreadth doctrine in first amendment law has taken a number of different forms, none of which provides grounds for sustaining appellants' facial attack.

■ First, overbreadth constitutes an exception to traditional rules of standing, an exception applicable only in first amendment cases. Litigants to whom a statute is constitutionally applied cannot generally seek its invalidation because it infringes the rights of hypothetical individuals not before the court. In order to avoid the chilling effect of an overbroad regulation of speech, however, such a challenge will be permitted under the first amendment. *See, e.g., Schaumburg v. Citizens for Better Environment,* 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980).

■ Second, when the overbreadth of a statute is *substantial* with reference to its "plainly legitimate sweep," *Broadrick v. Oklahoma,* 413 U.S. 601, 615, 93 S.Ct. 2908, 2917, 37 L.Ed.2d 830 (1973), and a narrowing construction is unavailable, facial invalidation will be in order. Overbreadth thus serves as both a jurisdictional doctrine and as a substantive doctrine of first amendment law. In such cases, the fact that *some* of the activity regulated may constitutionally be subject to restrictions is insufficient to save the statute. *See, e.g., Coates v. Cincinnati,* 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971).

■ Third, where the party challenging the statute is *himself* engaged in protected speech which the overbroad statute seeks to punish, a court will follow the more traditional practice—invalidate the statute to the extent that it reaches protected conduct, while leaving the remainder intact. In such instances, the Court leaves in force that portion of the statute that regulates activity in a constitutionally permissible manner. *See, e.g., Brockett v. Spokane Arcades, Inc.,* — U.S. —, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985).

■ While appellants regard their own planned activities as protected, they do not offer any limiting construction to this court. They seek instead a facial invalidation on grounds of overbreadth. The Supreme Court has characterized the facial

---

17. The dissent states that we have ignored circuit precedent by reading the second clause of § 22–1115 as we do. The precedent to which the dissent refers is *Zaimi,* 476 F.2d at 515, in which we held that the second clause was functionally separate from the first. The dissent misunderstands our analysis. We do not believe that the second clause is limited by the first, *i.e.,* that police may order dispersal only where the congregation is displaying signs of the sort described. Rather, we believe the provision is limited by the general purposes which motivated the enactment of the statute as a whole, *i.e.,* protection of the peace and security of the embassy. Dispersals may only be ordered in accord with those purposes.

invalidation of a statute because of overbreadth as "manifestly, strong medicine," to be employed "sparingly." *Broadrick v. Oklahoma,* 413 U.S. at 613, 93 S.Ct. at 2916. The Court has therefore held that "particularly where conduct and not merely speech is involved, ... the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Id.* at 615, 93 S.Ct. at 2917. When the central requirement of substantiality is met, it is often because the statute contains a fundamentally illegitimate predicate for government action, or was premised on an unsupported assumption that purported to tie its means to its ends. For example, in *Coates v. Cincinnati,* the Supreme Court struck down a city ordinance forbidding three or more persons from assembling on a sidewalk and conducting themselves "in a manner annoying to persons passing by." 402 U.S. at 611, 91 S.Ct. at 1686. The statute was overbroad because, while many annoying activities—such as disturbance of the peace—could constitutionally be regulated, "mere public intolerance or animosity cannot be the basis" for such a law. *Id.* at 615, 91 S.Ct. at 1689. In *Schaumburg v. Citizens for a Better Environment,* an ordinance prohibiting street solicitations by charitable organizations that did not use at least 75% of their receipts for "charitable purposes" was invalid because—despite the fact that *some* of these organizations were undoubtedly subject to regulation—the percentage figure was not a relevant measure of the integrity of the organization, or the threat it posed to public safety or residential activity, which were the interests asserted to be at stake. 444 U.S. at 636, 100 S.Ct. at 835. In such cases, what renders a statute's overbreadth substantial is that the error taints the entire provision—the statute "in *all* its applications directly restricts protected First Amendment activity and does not employ means narrowly tailored to serve a compelling governmental interest." *Secretary of State of Maryland v. Joseph H. Munson Co.,* 467 U.S. 947, 965–66 n. 13, 104 S.Ct. 2839, 2851–52, 81 L.Ed.2d 786 (1984) (emphasis added).

Even when all its applications are not so tainted, a statute may be substantially overbroad when its potential for application to protected activity overwhelms its potential for application to unprotected activity.

Our analysis is guided by *Broadrick v. Oklahoma,* in which the Court explained:

[T]he plain import of our cases is, at the very least, that *facial overbreadth adjudication is an exception to our traditional rules of practice* and that *its function, a limited one* at the outset, attenuates as the otherwise unprotected behavior that it forbids the State to sanction moves from "pure speech" toward conduct and that conduct—even if expressive—falls within the scope of otherwise valid criminal laws that reflect legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct. *Although such laws, if too broadly worded, may deter protected speech to some unknown extent, there comes a point where that effect—at best a prediction—cannot, with confidence, justify invalidating a statute on its face and so prohibiting a State from enforcing the statute against conduct that is admittedly within its power to proscribe.*

413 U.S. at 615, 93 S.Ct. at 2917 (emphasis added).

 Appellants have not made anything like the showing of substantial overbreadth needed to justify a facial invalidation. They argue that the statute is overbroad because

[i]t prohibits any form of peaceful expression by any member of the public who displays a sign designed to disagree with a foreign government's views. It goes so far as to prohibit anyone with an anti-Soviet lapel button from walking within 499 feet of the Soviet Embassy.

Brief for Plaintiffs-Appellants at 50–51.

Any statute that sets clear limits—and so avoids the charge of vagueness—will be subject to this sort of overbreadth attack. It might be noted that the statute does not apply when someone with an eight-foot,

anti-Soviet sign stands 501 feet from the Soviet Embassy. The only cure for the kind of overbreadth appellants complain of would be a statute that carefully correlated the size of signs and lettering with the permissible degree of distance from the Embassy. The person wearing the lapel button might be allowed to go up to ten feet from the property while the person with the eight-foot sign might not be allowed within a thousand feet. The first amendment does not require such a complex and difficult-to-police sliding scale. Congress has made a reasonable attempt to balance the interests protected by the first amendment and the combined interests of United States foreign policy and obligations under international law. The balance struck is, as it should be, favorable to first amendment interests.

In addition to the need to ensure security, the other requirement imposed by the Vienna Convention—the maintenance of the peace and dignity of the embassy premises—is clearly contained within section 22–1115's "plainly legitimate sweep," and demonstrations, even those by lone protestors, may threaten fulfillment of that obligation without necessarily posing a threat of violence. Appellants thus offer us no real basis on which to conclude that section 22–1115 is overbroad or substantially so.[18]

### D.

Appellants have offered one further argument meriting discussion—that the content-based restriction itself is not narrowly tailored to serving the interests at stake and is therefore unconstitutional.[19] Were we to accept this argument, we would have to strike the statute in its entirety. We can imagine other statutes, however, in which the element of content discrimination would be more neatly severable—statutes, for example, which exempt narrow categories of speech from regulations otherwise universally applicable.[20] In such instances, if the court were to strike only the element of discrimination and leave a flat and neutral prohibition in place, it would be narrowly tailoring the statute by broadening its application—a peculiar outcome, but one that would end the equal protection problem. We note this anomaly to illustrate the potential clash between the first amendment doctrines of overbreadth and equality. As a legislature narrows a statute to ensure that no more speech is regulated than is absolutely necessary, it begins differentiating among types of speech activities. A total prohibition, in contrast, is the most neutral statute of all.

The differentiation at issue in this case is easy to justify. This statute was enacted in order to protect foreign embassies from the potential of violence, and threats to its peace and dignity, and to enhance the security of our own diplomats and citizens overseas. Demonstrations called to express support for foreign governments in

---

18. Appellants also contend that the statute is substantially overbroad because it regulates criticism of *any* foreign government in front of *any* foreign embassy. In other words, the statute, in appellants' view, prohibits an anti-Israel demonstration in front of the Syrian Embassy. We think this construction implausible in light of the purposes behind the provision's enactment. We think it in any event precisely the sort of challenge that ought to be made by an individual prevented from so demonstrating, and one which, if successful, would call for a limiting construction rather than facial invalidation. In the absence of any evidence that the statute has *ever* been applied in such a fashion, we will not entertain such a challenge now. *See Regan v. Time*, 468 U.S. at 649–52, 104 S.Ct. at 3267–69 (overbreadth challenge "unavailing" when there is "no evidence" that the statute will be interpreted as feared).

19. Appellants also maintain that the exception to § 22–1115 for labor picketing, codified in § 22–1116, is an unconstitutional content-based restriction. We reject this argument for the reason given by the three-judge court in *Jewish Defense League v. Washington*, 347 F.Supp. 1300 (D.D.C.1972).

20. The law invalidated by the Supreme Court in Police Department of *Chicago v. Mosley*, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972), was one such statute. It prohibited all picketing within 150 feet of a school, except peaceful picketing of any school involved in a labor dispute. The Court held that the statute violated the equal protection clause, but never explained its decision to strike the statute rather than the exemption.

front of their embassies simply do not threaten these interests. Congress was not obliged to regulate such demonstrations for the sake of symmetry, and its decision not to do so does not disable it from regulating demonstrations that *do* threaten these interests. It is precisely *because* this statute is narrowly tailored that it contains a content-based restriction. The content-based portion of section 22–1115 is thus tailored to serve two compelling interests simultaneously—it regulates expressive conduct that may threaten to undermine American compliance with international law and the safety of foreign and American diplomats, while leaving unregulated expressive conduct that does not. It would turn overbreadth analysis on its head to maintain that Congress is *required* to regulate more speech than necessary.

There is some force to the argument that a broad regulation which affects all speech equally raises fewer constitutional problems than one which regulates less aggregate speech but discriminates while doing so. At the very least, they raise different problems. However, the fundamental concern underlying the disfavored status accorded content-based restrictions is not implicated by section 22–1115. There is no "preferred view" the government is seeking to promote, nor a minority view it seeks to suppress. In fact, there is no single point of view targeted at all; under the most reasonable interpretation of the statute, *see supra* note 18, what is prohibited in front of the East German Embassy is permitted in front of the West German one, and vice versa.[21] We therefore do not find the distinction embodied in section 22–1115 troublesome, although it is indisputably content-based. A principle of international law that shields embassies from various forms of hostile activity is itself necessarily content-based. In order to protect the safety, peace and dignity of foreign embassies, Congress need not prohibit speech activities that it deems do not implicate such concerns, any more than a locality that wished to prohibit the shouting of "Fire!" in a crowded theatre would be constitutionally required to outlaw the shouting of "Encore" as well.[22]

**21.** In a declaration filed below, Father Finzer stated: "I ... believe that my conservative colleagues and I are being discriminated against because of the nature of our political beliefs." Declaration of Father R. David Finzer at 5, R.E. at 19. Appellants have supplemented the record before us with a press release issued by the city government, entitled "District Drops Charges in South Africa Case." In this press release, District of Columbia Corporation Counsel Inez Smith Reid announced that the District would be dropping charges against five persons who crossed a police barricade during a demonstration at the South African Embassy. Ms. Reid said:

> It would be untenable for the Office of the Corporation Counsel to prosecute these five individuals who demonstrated peaceably to call attention to the gross injustices which result from the South African policy of apartheid. We are aware that the United States Attorney for the District of Columbia has dropped charges against several of those arrested at the South African Embassy. For us not to do so would set an inconsistent policy with respect to the prosecution of those arrested at the South African Embassy. Finally, no significant District of Columbia interest would be served by these prosecutions.

These five individuals were arrested pursuant to local laws, while those the U.S. Attorney decided not to prosecute had been arrested pursuant to § 22–1115.

We do not have before us any similar documents from the U.S. Attorney's office and we decline to speculate, absent substantial evidence, about its motives and rationales. We note, however, that a statute constitutional on its face may not be applied in an unconstitutional manner. *Yick Wo v. Hopkins*, 118 U.S. 356, 65 S.Ct. 1064, 30 L.Ed.220 (1886). The boundaries of prosecutorial discretion are quite wide, but they are not limitless. *Oyler v. Boles*, 368 U.S. 448, 456, 82 S.Ct. 501, 505, 7 L.Ed.2d 446 (1962). Because the plaintiffs before us have not pressed a claim of selective prosecution, we offer no opinion on the constitutional issues such a claim might raise.

**22.** The dissent misses the point of this analogy, dissent at 1495 n. 22, which is that when only one particular category of speech threatens the legitimate interest the legislature seeks to promote, other, nonthreatening categories need not necessarily be regulated as well. The dissent compares § 22–1115 to a law allowing theatre-goers to shout "Encore" but not "Boo." If shouting "Boo," but not "Encore," had the same effect as shouting "Fire," then the law could permissibly regulate the shouting of "Boo" and "Fire" while leaving "Encore" alone.

## VI.

The dissent's apocalyptic version of what is at stake here requires that we once more attempt to place this case in realistic perspective. The dissent argues as though the statute before us attempted the general suppression of entire categories of speech rather than merely preventing the offering of political insult within the immediate vicinity of a foreign embassy. The placard provision of the statute involves only the latter and, for that reason, the dissent's extensive quotations about the central role of the first amendment in our national life are, to say the least, disproportionate. This is simply not a statute that threatens "our free speech birthright," the "silencing of Americans in their views," the "distort[ion of] the marketplace of ideas," or the "mutilat[ion of] 'the thinking process of the community.'" Dissent at 1477, 1487, 1490. The excitement generated by such rhetoric is quite spurious in the context of the 500–foot radius in which this regulation operates.

The dissent objects to section 22–1115 on the ground that it bars only the carrying of hostile placards and not of supportive placards within 500 feet of an embassy. The ground for this objection is that the narrower prohibition distorts the marketplace of ideas by allowing the presentation of one side only.

This objection is entirely theoretical; indeed, if the word may be used in a pejorative sense, it is merely academic. There simply is not and never has been a problem with carriers of supportive placards. More to the point, there is not and never has been political debate about the merits of foreign governments and their policies within 500 feet of their embassies. The dissent's argument conjures up a picture of rival speakers at podiums before the Nicaraguan embassy while the nation watches. There is simply no reality in that picture. The debate about Nicaragua is carried on in innumerable fora in Washington and across the nation but no such debate has entered the marketplace of ideas and our nation's political process from the area bounded by a radius extending 500 feet from 1627 New Hampshire Avenue, N.W. If preventing Finzer from displaying a sign critical of the Sandinistas at that address has mutilated the thinking process of the community, the effect has not been noticeable.

In response, the dissent makes reference to the anti-apartheid demonstrators who have picketed the South African Embassy this last year, and to the significance of their protest in shaping the public debate. Dissent at 1499–1500. It is difficult to know what point the dissent seeks to make with this example. The "less restrictive" alternative favored by the dissent would have prohibited those demonstrations as thoroughly as section 22–1115. The question is whether the public debate has in any way been warped out of shape because these demonstrations are prohibited and some wholly imaginary supportive demonstrations are not. To state the question is to answer it.

## VII.

While we hold therefore that section 22–1115 is constitutional, we remand to the district court with instructions to make factual and legal findings with respect to one further issue. The Complaint and Declarations below contained allegations of incidents in which police officers, claiming to be enforcing section 22–1115, prevented some of the appellants from engaging in activity which section 22–1115 plainly does not proscribe. For example, Finzer claims to have been prevented from kneeling on the sidewalk directly in front of the Soviet Embassy to pray silently, Declaration of Father R. David Finzer at 2, R.E. at 16, and Brooker describes an occasion in which she was told she could not stand in front of the Soviet Embassy "to say the Lord's Prayer." Declaration of Bridget Brooker at 2, R.E. at 22. The record does not reveal the context in which these incidents took place, but we note that the first part of section 22–1115 applies only when a protestor is carrying a sign of some sort, and the second part applies only when a congregation

of people has been ordered to disperse. *See Zaimi v. United States,* 476 F.2d 511 (D.C.Cir.1973). If neither of these conditions applied, then the appellants were wrongfully prevented from conducting their protest. While the District of Columbia Corporation Counsel has indicated that appellants will not be prosecuted for such activity, Defendants' Statement of Material Facts in Dispute, R.E. at 34, we have no similar statement before us from the Office of the United States Attorney in Washington, D.C., which also has prosecutorial jurisdiction over these matters. If section 22–1115 has been interpreted to prohibit conduct that is in fact clearly beyond its scope, a declaratory judgment prohibiting official interference with activities outside its proper reach would be appropriate.

## VIII.

We wish to reiterate, in conclusion, the special circumstances that surround the provision whose constitutionality we have upheld. It represents an exercise by Congress not simply of the police power, but of its authority and responsibility under the Constitution to impose upon citizens what it understands to be the obligations required by international law. It does not eliminate any point of view from our political discourse, but sets aside the space immediately surrounding foreign embassies as an area free from hostile protest. The unique restrictions imposed are justified by the unique interests that are at stake, interests which include the safety of American personnel living abroad in a time in which international incidents provide regular reminders of the precariousness of their position. We think Congress acted within its authority when it required that these demonstrations take place elsewhere in the District. We therefore affirm the constitutionality of section 22–1115, and remand this case to the district court for a determination of whether the local authorities have exceeded the scope of their statutory authority.

*It is so ordered.*

WALD, Chief Judge, dissenting:

Perhaps no two national interests engender so much deserved passion as the security of our citizens at home and abroad and the freedom of these same citizens to speak out on issues of public importance. Recent times have, unfortunately, taught us that we cannot always have a full measure of both. But even within the shadow of treachery and terrorism, we must not too hastily surrender our free speech birthright to phantom national security interests and international obligations. We must at the least demand reasonable proof that genuine issues of security or treaty obligations are implicated. The survival of our most cherished freedoms in time of trial requires that courts carefully scrutinize the strength of competing foreign relations and free speech interests and ensure that the "delicate balance" is rightly struck.

Everyone involved in this case is all too cognizant of the dangers right now facing our embassies abroad and the embassies of foreign sovereigns in our own country. I would be reluctant to challenge the validity of a 100 or even a 500 foot ban on picketing or demonstrating in front of an embassy based on genuine security concerns. That is not, however, what is involved in this case. This case involves the discriminatory application of a ban to some demonstrators but not others, based not on the need to protect the embassy's security but on the more amorphous need to prevent affronts to the "dignity" of the embassy.

I realize, too, that we must inevitably defer to the superior knowledge and responsibilities of the political branches of our government on the risks involved in certain courses of conduct in foreign affairs. But I am equally convinced that we must adamantly protect free speech and the right to express political dissent, not just about our own country's but about other countries' policies. Debate over such essential matters must not be unnecessarily restricted, particularly if there is no offsetting gain to security at home and abroad. To permit fears of irrational behavior by others to so dominate our thinking that we do not insist on proof that

substantial restrictions on free speech are in fact required by "national interests and international obligations," maj. op. at 1455, presents risks to our basic freedoms that are more deadly than any terrorists' blows.

A painstaking assessment of the plaintiffs' facial attack on the constitutionality of this statute leads me to conclude that parts of it violate the first amendment. The majority makes an eloquent case for upholding the statute in its entirety because Congress[1] and the executive, the branches charged with protecting foreign countries' presence here and our own citizens abroad, have approved it. It is inappropriate, the majority argues, for the judiciary to scrutinize too severely the decision of those branches that this particular law is "necessary to fulfill our obligations." Maj. op. at 1459–60. Summing up its case for superdeference, the opinion concludes that

a court cannot lightly dispute a determination by the political branches that the statute meets important international obligations, that the interests at stake are compelling, or that those interests cannot be met by a statute with a more narrow reach.

*Id.*

The majority's warning is intimidating but, like much of the free speech/national security debate, assumes that a choice rather than an accommodation must be made between the two goals. Although the majority rightly identifies the core issue in this case as the need to strike a permissible accommodation "between the United States' national interests and international obligations and the first amendment's guarantee of free speech," maj. op. at 1455, the only accommodation it recognizes as legitimate is that struck by Congress or the executive. It is too willing, in my view, to sacrifice first amendment freedoms to the *generality* of political decisionmaking in the area of foreign affairs without carefully inquiring whether international obligations and national security concerns are really implicated at all, and if they are, whether the statute fulfills those interests with the least amount of intrusion into cherished constitutional rights.

Thus, the fatal flaws I see in the statute and in the District Court's decision summarily upholding it *have nothing to do* with the degree of deference we must give to the assessments of the other branches on matters of foreign affairs. Rather, they involve quintessentially legal judgments about accommodating one aspect of

---

**1.** The majority speaks often and fondly of the need to defer to Congress' balancing of free speech interests and the dictates of the Law of Nations, but acknowledges that the balance reached in 1937, before any of the relevant Supreme Court decisions on content-discrimination issued, must be reassessed in light of those dramatic changes in first amendment jurisprudence. *See* maj.op. at 1454.

Recent congressional action in the area casts doubts on whether today's Congress agrees that D.C.Code § 22–1115 reflects the right constitutional balance. From 1972 to 1976, the statute that governs embassies in the fifty states penalized anyone who

(1) parades, pickets, displays any flag, banner, sign, placard, or device, or utters any word, phrase, sound or noise, for the purpose of intimidating, coercing, threatening, or harassing any foreign official or obstructing him in the performance of his duties, or

(2) congregates with two or more persons with the intent to perform any of the aforesaid acts.

18 U.S.C. § 112. In 1976, however, Congress amended § 112 to eliminate the prohibition on banners, signs, placards, or devices. The amendment was explained on the ground that the old statute "raises serious Constitutional questions because it appears to include within its purview conduct and speech protected by the First Amendment." H.R.Rep. No. 1614, 94th Cong., 2d Sess. 6 n. 9, *reprinted in* 1976 U.S. Code Cong. & Ad.News 4480, 4484 n. 9; S.Rep. No. 1273, 94th Cong., 2d Sess. 8 n. 9 (1976). Thus, even though the pre-amendment § 112 was far less restrictive of speech than D.C.Code § 22–1115 is, Congress thought it necessary to amend it to conform with the dictates of the first amendment.

This post-enactment history is not, of course, *evidence* of how Congress feels about the D.C. Code provision's constitutionality. It is *evidence*, however, that Congress has re-evaluated the proper balance between embassy security and first amendment interests and that the 1937 statute, now part of the local District of Columbia Code, may no longer reflect Congress' current views as to where that balance lies. *See infra* at 1465 n. 10.

the Law of Nations, relating to "appropriate" safeguarding of an embassy's "dignity," with the dictates of first amendment law, already established in Supreme Court decisions. I am, to paraphrase a recent Supreme Court pronouncement on deference in the context of foreign affairs,

> cognizant of the interplay between [this case] and the conduct of this Nation's foreign relations, and [I] recognize the premier role which both Congress and the Executive play in this field. But under the Constitution, one of the judiciary's characteristic roles is to interpret [that document], and [I] cannot shirk this responsibility merely because our decision may have significant political overtones.

*Japan Whaling Association v. American Cetacean Society,* —— U.S. ——, ——, 106 S.Ct. 2860, 2865, 92 L.Ed.2d 166 (1986). There is still room for the courts to levy "severe scrutiny" before upholding a law which on first glance looks like a classic, textbook example of prohibited viewpoint discrimination and unbridled police discretion.

D.C.Code § 22–1115 suffers from numerous constitutional infirmities. Section I sets out the standards that are used in analyzing content-based speech restrictions and establishes that the majority's reliance on the Law of Nations does not alter those standards in any significant way. Section II reviews the interests that the government relies on to justify the statute, and concludes that the only "compelling" interests involved in this case are those related to security; protecting the "dignity" of embassies, unless it can be directly tied into a security interest, cannot justify a content-based distinction. Section III tests the statute against the D.C. government's asserted security interest, and demonstrates that the statute is both fatally overinclusive and underinclusive. Moreover, even if

its fit with those security interests were tighter, its viewpoint discrimination would still be constitutionally unjustifiable since a viewpoint-neutral regulation is readily available that would advance legitimate security interests in a manner far less restrictive of free speech values. Finally, Section IV turns to the second clause of the statute and concludes that its vesting in police officers of standardless discretion to disperse a congregating group is facially unconstitutional.

## I. The Appropriate Standard of Scrutiny

### A. Content-Based Distinctions

"[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Department v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 2289, 33 L.Ed.2d 212 (1972). Unlike content-neutral time, place, or manner restrictions where the government has a relatively light burden to carry in justifying regulation, the government has an exceptionally heavy burden to bear when it seeks to justify a content-based restriction on speech. *See Regan v. Time, Inc.,* 468 U.S. 641, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984); *Widmar v. Vincent,* 454 U.S. 263, 270, 102 S.Ct. 269, 274, 70 L.Ed.2d 440 (1981); *Police Department v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). The government must demonstrate that the statute "is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Perry Education Association v. Perry Local Educators' Association,* 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983). As part of the "necessary" and "narrowly drawn" inquiries, the government must show that "no adequate alternative" exists that would be less restrictive of speech.[2] *Carey v. Brown,* 447 U.S. 455,

---

2. "The term 'narrowly tailored,' so frequently used in our cases, has acquired a secondary meaning. More specifically, as commentators have indicated, the term may be used to require consideration whether lawful alternative and less restrictive means could have been used."

*Wygant v. Jackson Board of Education,* —— U.S. ——, 106 S.Ct. 1842, 1850 n. 6, 90 L.Ed.2d 260 (1986) (Powell, J., plurality opinion).

By contrast, the Supreme Court has instructed that "less-restrictive-alternative analysis ... has never been a part of the inquiry into the validity

.465, 100 S.Ct. 2286, 2292, 65 L.Ed.2d 263 (1980). *See also Gay Student Services v. Texas A & M University,* 737 F.2d 1317, 1331 (5th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1860, 85 L.Ed.2d 155 (1985); *Frumer v. Cheltenham Township,* 709 F.2d 874, 877 (3d Cir.1983). In short, whenever the government has regulated speech on the basis of content, the Court has applied the "most exacting scrutiny," *Widmar,* 454 U.S. at 276, 102 S.Ct. at 277 "to determine whether there is any method of achieving the state's ... purposes ... which has a lesser effect on protected expression." *Tacynec v. City of Philadel-* *phia,* 687 F.2d 793, 798 (3d Cir.1982), *cert. denied,* 459 U.S. 1172, 103 S.Ct. 819, 74 L.Ed.2d 1016 (1983).

There is no doubt that D.C.Code § 22–1115 is a content-based statute.[3] It prohibits only demonstrations involving signs[4] that hold the foreign government up to public odium or disrepute, while allowing signs that do not. In their briefs and arguments before this court, "[n]either appellees nor amicus dispute[d] the fact that § 22–1115 is a content based act." Brief for Amicus Curiae United States of America at 16. The majority recognizes this.[5] *See* maj. op. at 1475.

of a [content-neutral] *time, place, and manner regulation.* It is enough that the ... restriction substantially serves the Government's legitimate ends." *Regan v. Time, Inc.,* 468 U.S. 641, 657, 104 S.Ct. 3262, 3272, 82 L.Ed.2d 487 (1984) (emphasis added); *see also White House Vigil for ERA Committee v. Clark,* 746 F.2d 1518, 1528–29 (D.C.Cir.1984) (refusing to apply least-restrictive-alternative analysis to content-neutral time, place, and manner restriction).

**3.** Indeed, even more threatening to our constitutional values, it is a viewpoint-based statute. *See infra* at 1492–96.

**4.** The first clause of the statute encompasses "any flag, banner, placard, or device." For convenience sake, I shall refer to this entire class as signs.

**5.** The majority suggests, however, that under *City of Renton v. Playtime Theatres, Inc.,* —— U.S. ——, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), "§ 22–1115 may not in fact qualify as a content-based statute." Maj.op. at 1469, n. 15. In that case, the Supreme Court held that zoning of adult theatres designed to "protect the city's retail trade, maintain property values, and generally 'protec[t] and preserv[e] the quality of [the city's] neighborhoods, commercial districts, and the quality of urban life,' not to suppress the expression of unpopular views," did not trigger the scrutiny reserved for typical content-based regulations. 106 S.Ct. at 929. The Court found the "resolution of [the] case largely dictated by [the] decision in *Young v. American Mini Theatres, Inc.,* [427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) ]." *Renton* and *Young,* however, are obviously and dramatically different from the case at bar.

In upholding the Renton ordinance, the Court stressed that the "ordinance does not contravene the fundamental principle that underlies our concern about 'content-based' speech regulations: that 'government may not grant the use of a forum to people whose views it finds ac- ceptable, but deny use to those wishing to express less favored or more controversial views.'" *Id.* 106 S.Ct. at 929 (quoting *Mosley,* 408 U.S. at 95–96, 92 S.Ct. at 2289–90; *see also Young,* 427 U.S. at 67–68, 96 S.Ct. at 2450–51 (opinion of Stevens, J.). In this case, the government has done just that. Unlike the Renton ordinance, D.C.Code § 22–1115 turns on the viewpoint of the speaker, and there can be no denying that one of the predominant reasons for the restriction is to prohibit the airing of views that are disfavored by those occupying foreign embassies. *See infra* at 1493.

The fact that the statute was indeed enacted in order to shield foreign emissaries from the content of speech eliminates any analogy to *Renton* where the Court held that the ordinance was only aimed at "secondary effects." 106 S.Ct. at 929. Here, a major part of the perceived evil is the content of the speech itself, and the emotive impact of it. If listeners' reaction to the content of speech is deemed to be a "secondary" effect, then there is nothing left at all of the content-based distinction doctrine. Yet, on the day it decided *Renton,* the Court also issued its decision in *Pacific Gas & Electric Co. v. Public Utilities Commission,* —— U.S.——, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986), in which it reaffirmed the content doctrine. *Id.* 106 S.Ct. at 914 ("For a time, place, or manner regulation to be valid, it must be neutral as to the content of the speech to be regulated.").

Finally, it is important to keep in mind that *Renton* was dealing with the issue of adult theatres. For good or for bad, the Supreme Court has adopted the view that not all speech is privy to the same protection. As Justice Stevens explained in *Young,* "[w]hether political oratory or philosophical discussion moves us to applaud or to despise what is said, every schoolchild can understand why our duty to defend the right to speak remains the same. But few of us would march our sons and daughters off to war to preserve the citizen's right to see 'Specified Sexual Activities' exhibited in the theaters of our

## B. *The Law of Nations*

Before proceeding to analyze the "compelling" interests advanced by the D.C. government in support of the statute, I will address the linchpin in the majority's rationale for upholding the statute: that the United States has a special duty under the customary Law of Nations and Article 22 of the Vienna Convention on Diplomatic Relations "to take all appropriate steps to protect the premises of the mission against any intrusion or damage and to prevent any disturbance of the peace of the mission or impairment of its dignity." 23 U.S.T. 3227, 3237, T.I.A.S. No. 7502; *see* maj. op. at 1457. The opinion cites Senator Pittman, the sponsor of § 22–1115, as relying on the Law of Nations for the obligation of a host country to protect a foreign embassy against not only physical invasion but "an offensive demonstration ... not only against insult, but against any character of annoyance or interference that will bring the hatred of the people of his country against our people." *See* maj. op. at 1457.

Senator Pittman's rhetorical protectorate is a tall order indeed and, if taken literally, would include a ban against offensive editorials in the local newspapers as well as critical citizens parading in front of the embassy. The Vienna Convention is, after all, not limited to the "premises" of the embassy but prohibits any "impairment of its dignity," *see supra* at 1481, presumably referring to the dignity of a nation or its officials, not a building. Yet it is quite clear that the Law of Nations embodies no such requirement. The United States government has often cited the constitutional limitations on its ability to curtail freedom of expression in response to complaints by foreign embassies of insult or annoyance by American citizens. In the 1930s, the Constitution was invoked to fend off requests by the German government to stop the showing of an anti-Hitler film in Chicago and to prevent a mock trial of

Hitler from taking place in Madison Square Garden. In 1941, the Egyptian prime minister complained to the United States about an article in *Foreign Affairs* calling the King of Egypt a "quisling," but was mollified by our government's explanation that it could do nothing but apologize since its Constitution contains guarantees of freedom of the press. M. Whiteman, 5 *Digest of International Law* 160–62, 168 (1965).

Our government has similarly invoked the first amendment in response to complaints of insult stemming from protected activities in the vicinity of foreign missions and consulates. When, in 1958, the Soviet delegation to the United Nations complained about a demonstration in front of its building, the United States declined to take action, explaining that it could not "associate itself with any attempts to abrogate the constitutional rights of residents of the United States to gather in peaceful assembly and to express their beliefs and convictions." M. Whiteman, *supra*, Vol. 7 at 385 (1970). Several years later, the United States again rebuffed a Soviet complaint, contending that no principles of international law were violated when a synagogue across the street from the Soviet mission erected a plaque pointedly referring to "the cry of the oppressed ... Jewish Community in the Soviet Union." *Id.* at 384. More recently, in 1979, the United States refused to act when the Soviets complained about demonstrations near their San Francisco consulate, noting that the protest was peaceful and legal under 18 U.S.C. § 112. M. Nash, *Digest of United States Practice in International Law* 674 (1979).

Under the majority's broad brush analysis of the relationship between the Law of Nations and the first amendment, the United States probably could and indeed should have taken all of the requested actions. Its refusal to do so suggests that its offi-

---

choice." 427 U.S. at 70, 96 S.Ct. at 2452. Along the continuum, there can be no doubt that political speech, such as that abridged in this case, is entitled to the utmost protection. *See Brown v. Hartlage,* 456 U.S. 45, 52, 102 S.Ct. 1523, 1528,

71 L.Ed.2d 732 (1982); *In re Primus,* 436 U.S. 412, 437–38, 98 S.Ct. 1893, 1907–08, 56 L.Ed.2d 417. *See generally* Bork, *Neutral Principles and Some First Amendment Problems,* 47 Ind.L.J. 1, 20 (1971).

cials entertain, as I do, serious doubts about "the framers['] underst[anding] that the protection of foreign embassies from insult was one of the central obligations of the law of nations." Maj. op. at 1457.[6] At a minimum, these tolerated insults and annoyances visited upon foreign diplomats by United States citizens clearly illustrate that our government's obligations under the Law of Nations are not as rigidly circumscribed as Senator Pittman and the majority would have us believe. The mere fact that the United States' obligation is flexible does not, of course, mean that it is not compelling, cf. maj. op. at 1465, but does indicate that first amendment interests can be accommodated under the Law of Nations without imposing the constitutionally dubious strictures of § 22–1115.

The reasonableness and flexibility of the Law of Nations is further illustrated by the quite temperate language of Article 22 of the Vienna Convention, the obligations of which are purportedly fulfilled in part by § 22–1115. Article 22 provides only that governments have a "special duty" to take "appropriate" steps to protect the peace and dignity of the mission. 23 U.S.T. 3227, 3237, T.I.A.S. No. 7502. The commentary on the draft of this Article states that "in order to fulfill this obligation [a government must] take special measures—over and above those it takes to discharge its general duty of ensuring order." M. Whiteman, supra, Vol. 7 at 373 (1970). There is nothing in this language to indicate that consideration of what is "appropriate" should not encompass consideration of what is constitutional. See infra at 1485 & n. 10.

Article I, § 8 of the Constitution enumerates the areas within which Congress is generally authorized to act. As part of an extensive list, clause 10 provides that Congress has the power "[t]o define and punish ... Offences against the Law of Nations." Congress certainly may draw on Article I's Law of Nations clause for its

general authority to enact D.C.Code § 22–1115. But that being said, the Law of Nations does not answer the question of whether Congress, in enacting some of the provisions of § 22–1115, has violated the first amendment's provision that "Congress shall make no law ... abridging the freedom of speech." The Law of Nations clause, like the commerce clause or any other source of congressional authority, can be exercised only subject to express limitations found elsewhere in the Constitution.

Indeed, the majority opinion, after a nine-page discourse on the Law of Nations, finally recognizes this ultimate legal truth and concedes that "[t]he presence of a first amendment claim requires that the court examine the balance struck by the political branches," maj. op. at 1460, although only after admonishing that the examination must be conducted with superdeference to the conclusions of the political branches. The majority's attempt to lean so heavily and for so long on the Law of Nations to justify a statute that it implies might otherwise violate the first amendment is constitutionally troublesome, to say the least. See maj. op. at 1462 (the issue in this case is fundamentally "a question of living up to our obligations under international law and a treaty").

The Supreme Court has made clear that principles of international law and treaties cannot supersede our Constitution. In Reid v. Covert, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957), the Court explained that "[i]f our foreign commitments become of such nature that the Government can no longer satisfactorily operate within the bounds laid down by the Constitution, that instrument can be amended by the method which it prescribes." Id. at 14, 77 S.Ct. at 1229. The Court found it "obvious" that "no agreement with a foreign nation can confer power on the Congress, or on any other branch of Government, which is free from the restraints of the Constitution."

---

**6.** Many of the majority's examples—protections against acts of violence such as the tearing down of flags or tumultuous riots—are readily recognized as involving our government's obligations to protect the embassy's security rather than its dignity. See maj.op. at 1455–57.

*Id.* at 16, 77 S.Ct. at 1230. *See also Geofroy v. Riggs,* 133 U.S. 258, 267, 10 S.Ct. 295, 297, 33 L.Ed. 642 (1890), ("It would not be contended that [the treaty power] extends so far as to authorize what the Constitution forbids."). Similarly, the most recent Restatement of Foreign Relations Law explains that "rules of international law and provisions of international agreements of the United States are subject to the Bill of Rights and other prohibitions, restrictions or requirements of the Constitution and cannot be given effect in violation of them." Restatement of Foreign Relations Law § 131 comment a (Tent. Final Draft, July 15, 1985); *see also* L. Henkin, *Foreign Affairs and the Constitution* 251–54 (1972).

While invocation of congressional authority to punish offenses against the Law of Nations cannot override the first amendment, the concerns embodied in the Law of Nations can be evaluated to determine whether they rise to the level of "compelling interests" which warrant narrowly tailored restrictions on free speech. Just as "the nature and extent of first amendment rights may vary with the location at which their exercise is sought," maj. op. at 1462, the nature of an embassy and our responsibilities as international hosts weigh in the balance as to what is permissible regulation of free speech in that particular place. *See* L. Henkin, *supra,* at 254 ("One may expect that the national interest in war and peace and even lesser concerns of foreign relations would have important weight in any balance."). Contrary to the majority's suggestion, I do not "overlook[] that other law sometimes expresses values and concerns that are of legitimate constitutional dimension." Maj. op. at 1464. I examine both the dignity and security interests protected by the Law of Nations. *See infra* at 1484–87.

The Law of Nations, standing alone, does not, however, constitute an automatic "compelling interest" which justifies any limitation on free speech in the vicinity of embassies. Because I do not believe there is a compelling interest to weigh here, I fail to see how my analysis can be character-

ized as an "all-or-nothing" approach to first amendment balancing of "competing constitutional values." *Cf.* maj. op. at 1465. Simply because an interest is recognized in the compendious Law of Nations does not confer upon it the status of a compelling interest that must override any other constitutional guarantee. To say that it does would be to recognize *de facto* the Law of Nations as superior to the Constitution—a result which has been soundly rejected by the Supreme Court. We would agree, I presume, that no law could forbid black persons from demonstrating in front of embassies of countries that officially practice segregation on the grounds that it would "insult" them or be offensive to their dignity.

A treaty, like any other statute, represents Congress' assessment of the national interest. In reviewing both treaties and statutes against first amendment challenges, the court may not simply defer to that congressional judgment. To the contrary, the Supreme Court has instructed that the defender of any such law or regulation restricting free speech, be it of congressional or state origin, has the affirmative burden of proving its constitutionality. *See Philadelphia Newspapers, Inc. v. Hepps,* —— U.S. ——, 106 S.Ct. 1558, 1564, 89 L.Ed.2d 783 (1986). Legislative enactments of content-based speech restrictions have always been subjected to more severe scrutiny than other laws. In these supersensitive first amendment areas, the mere fact that Congress passed the act in the first place simply does not weigh in so heavily as it does in other kinds of constitutional inquiries. Resort to the Law of Nations cannot short-cut the arduous process of constitutional adjudication that requires a careful assessment of the particularized justification for any law that impinges free speech as severely as this one does. We must ask whether the abridgement is truly "necessary" to attain a compelling interest, and even if it is, whether it has been crafted in a way to restrict as few fundamental rights as possible. On this record, both

questions must be answered with a re-sounding "No."

## II. THE ASSERTED INTERESTS

The D.C. government asserts that D.C. Code § 22–1115 serves two separate compelling interests: first, it directly protects the security of foreign embassies and thereby it indirectly protects the security of our own embassies in foreign countries. Second, it helps preserve foreign embassies' dignity by shielding them from the insult of demonstrations that hold their governments up to public odium or disrepute. Our task is to decide whether these asserted interests are sufficiently compelling to justify overriding the free speech interests of citizen demonstrators.

### A. Security Interest

Our government has a unique and compelling interest in maintaining security for foreign embassies in Washington and in making efforts to increase the security of United States embassies abroad. Accordingly, statutory prohibitions must be upheld if they can be shown to be directly tied to these security interests[7] and properly crafted to advance these interests with minimal restrictions on free speech. Such security interests have been held to be important enough to justify content-neutral restrictions on speech in the vicinity of embassies and missions. *CISPES v. FBI,* 770 F.2d 468, 472–75 (5th Cir.1985); *Concerned Jewish Youth v. McGuire,* 621 F.2d 471, 474–76 (2d Cir.1980), *cert. denied,* 450 U.S. 913, 101 S.Ct. 1352, 67 L.Ed.2d 337 (1981). But the majority and I agree that the security interest cannot justify much of the content-based statute before us. *See infra* at 1487–90. Hence, we must look to some other interest which may serve to explain the statute's prohibitions. The government asserts that its interest in preserving the "dignity" of the embassies so qualifies.

### B. "Dignity" Interest

It is not at all apparent that the D.C. government's asserted interest in preserving foreign embassies' "dignity" is a compelling interest capable of overriding the constitutional guarantee of free speech. The courts in *CISPES* and *Concerned Jewish Youth* relied solely on security interests to affirm content-neutral speech prohibitions in the vicinity of consulates and missions, making no reference to the dignity interest asserted here. The majority nonetheless accepts, without question or analysis, the government's assertion that the statute is valid because it protects foreign embassies from the "insult" of being exposed to signs that oppose their governments' policies. The majority's calculus is that (a) since preservation of the dignity of embassies is required by the Law of Nations and (b) since the sign restriction is somehow related to the preservation of the dignity of the embassies, then (c) the sign restriction passes constitutional muster.[8]

---

**7.** Because I find no demonstrated connection between the hostile sign prohibition and the fear of foreign retaliation in this case, I need not decide whether fear of a foreign government's actions in response to peaceful criticism may ever justify infringement of an American citizen's constitutional rights. I admit to grave concerns about the degree or circumstances under which a foreign government's threats, through a grand-scale heckler's veto, can justify abridgement of constitutional rights. An admittedly extreme example makes the point: if some foreign country threatened to attack Americans abroad unless we rescind voting rights for blacks in the United States, that could hardly justify such discrimination.

**8.** At another point the majority argues that the "dignity" interest must be accepted as compelling because "a court cannot lightly dispute a determination by the political branches ... that the interests at stake are compelling." Maj.op. at 1459. The majority never explains, however, which political branch made this determination, and when they made it. Was Congress so omniscient that in 1937 it could anticipate future developments in first amendment law and carry out analyses that had not yet been developed? The fact is that recent congressional action casts doubt about whether Congress still thinks that the statute reaches a correct constitutional balance. *See supra* note 1. Thus, even if this notion of super-deference had a role to play in compelling interest scrutiny, there is no support for it in this case.

More generally, where the Supreme Court has desired lower courts to modify their usual methods of review in first amendment cases, it has

The majority's reasoning grossly misstates the relevance of the Law of Nations to this case. While the Law of Nations does impose some obligation to protect the dignity of foreign embassies, that obligation is flexible and does not require protection from all insult, especially at the expense of constitutional guarantees. *See supra* at 1481–82. In enacting protection for foreign emissaries outside the District of Columbia, for example, Congress has managed to fulfill its obligations to protect the dignity and security of foreign officials through the use of criminal penalties punishing harassment and through other content-neutral restrictions.[9] *See* 18 U.S.C. § 112 (1982). Certainly the Law of Nations does not have a special District of Columbia provision imposing extra duties on host governments here.[10]

I cannot accept the majority's conclusion that the preservation of an embassy's dignity is such a compelling interest that it can justify the content-based restriction on speech embodied in this statute. Settled first amendment principles establish that shielding listeners from hearing things they find offensive or politically distasteful is not an interest capable of supporting suppression of protected speech. Even crude, vile, or sexually explicit speech may not generally be forbidden because of its communicative impact. *See Bethel School District No. 403 v. Fraser,* —— U.S. ——, 106 S.Ct. 3159, 3164, 92 L.Ed.2d 549 (1986) ("use of an offensive form of expression may not be prohibited to adults making what the speaker considers a political point"); *Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 71–72, 103 S.Ct. 2875, 2882–83, 77 L.Ed.2d 469 (1983) (rejecting "offensiveness" interest even where less protected, commercial speech is involved);

clearly told us so. *See Goldman v. Weinberger,* —— U.S. ——, 106 S.Ct. 1310, 1313, 89 L.Ed.2d 478 (1986) ("Our review of military regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations designed for civilian society."). Deference to the political branches is not otherwise as broad in the first amendment context as in some other areas, even when issues of foreign affairs are involved. *See supra* at 1483; *New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (per curiam).

**9.** The statute punishes whoever congregates with two or more other persons within one hundred feet of a listed diplomatic building with intent to "intimidate[ ], coerce[ ], threaten[ ], or harass[ ]" a foreign official or an official guest or obstruct[ ] a foreign official in the performance of his duties." Relying on the complete content-neutrality of the statute, and only on the government's asserted security interest, the Fifth Circuit held in *CISPES* that the statute was constitutionally permissible. 770 F.2d at 472–75.

**10.** Despite the majority's attempts to vest the "dignity" interest with a congressional imprimatur, Congress' post-Vienna Convention enactments dealing with consulates and missions outside the District of Columbia have been far less concerned with protecting foreign emissaries against insult and far more sensitive to first amendment values than § 22–1115. Despite the long-standing nature of the Law of Nations' alleged concern with protecting embassies from annoyance and insult, until 1972 the only statutory protection afforded foreign diplomats outside D.C. was against violent acts. *See* 18 U.S.C.A. § 112 (1969). In 1972 the statute was amended to restrict harassing demonstrations near embassies in order "to protect the peace, dignity and security of foreign officials." S.Rep. No. 1105, 92d Cong., 2d Sess., *reprinted in* 1972 U.S.Code Cong. & Ad.News 4316, 4328; *see supra* at 1478 n. 1. The Senate was concerned about the first amendment implications of this prohibition, however, and added a provision to the final bill, still codified at 18 U.S.C. § 112(d) (1982), explaining that "[n]othing contained in this section shall be construed or applied so as to abridge the exercise of rights guaranteed under the first amendment to the Constitution of the United States." *Id., reprinted in* 1972 U.S. Code Cong. & Ad.News at 4330. Congress remained concerned about the free speech implications of its actions, however, and when it revisited § 112 four years later it repealed the picketing provisions, citing constitutional concerns. *See supra* at 1478 n. 1. Congress is presumably satisfied that 18 U.S.C. § 112 fulfills its duties under the Vienna Convention, even though it no longer contains anything remotely like the restrictions embodied in § 22–1115 and expressly directs that it be interpreted so as not to abridge first amendment rights. This congressional pronouncement is far more persuasive on the requirements of the Law of Nations and the Vienna Convention and their relation to the first amendment than the decades-old provisions of § 22–1115, enacted before the Vienna Convention and many of the important developments in first amendment law.

*Cohen v. California*, 403 U.S. 15, 21, 91 S.Ct. 1780, 1786, 29 L.Ed.2d 284 (1971) ("The ability of government, consonant with the Constitution, to shut off discourse solely to protect others from hearing it is ... dependent upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner."); *Coates v. City of Cincinnati*, 402 U.S. 611, 615, 91 S.Ct 1686, 1689, 29 L.Ed.2d 214 (1971) ("Our decisions establish that mere public intolerance or animosity cannot be the basis for abridgment of these constitutional freedoms.").

How much stronger the impediment when the offensiveness of the speech is based on the fact that the audience disagrees with the political message of the speaker. *See Street v. New York*, 394 U.S. 576, 592, 89 S.Ct. 1354, 1365, 22 L.Ed.2d 572 (1969). As the Supreme Court has recognized,

> a function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech, though not absolute ..., is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest.

*Terminiello v. Chicago*, 337 U.S. 1, 4, 69 S.Ct. 894, 895, 93 L.Ed. 1131 (1949). So precious is our freedom of speech that courts have felt compelled to protect politically oriented exercises of free speech as offensive, and potentially inflammatory, as Nazi marches and Ku Klux Klan rallies. *See Collin v. Smith*, 578 F.2d 1197 (7th Cir.) (Nazi rally in Skokie, Illinois), *cert. denied*, 439 U.S. 916, 99 S.Ct. 291, 58 L.Ed.2d 264 (1978); *Knights of Ku Klux Klan v. East Baton Rouge Parish School Board*, 578 F.2d 1122 (5th Cir.1978) (Ku Klux Klan rally). The Supreme Court has held that the first amendment even requires states to tolerate advocacy of the use of force or of law violations except "where such advocacy is directed to inciting or producing *imminent* lawless action and is likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969) (emphasis added); *see also Hess v. Indiana*, 414 U.S. 105, 108, 94 S.Ct. 326, 328, 38 L.Ed.2d 303 (1973) (per curiam).

The government nonetheless asks us to break new doctrinal ground here and to recognize a compelling interest in shielding foreign emissaries from speech which they find offensive because of its political content.[11] The majority asserts that because foreign officials have no obligation to be accessible to public protest or to participate in the clash of ideas central to our democratic process, the general ban against censoring unpopular speech is inapposite here. Maj. op. at 1462, 1467. I disagree. This key first amendment principle is based on the need to protect the rights of the *speaker* and so its application does not generally turn on the type of *listener* involved.[12]

---

**11.** This is not a case, like those cited by the majority, maj. op. at 1462, where the nature of the demonstration site is functionally incompatible with free speech. We are dealing here with public sidewalks. First, no aesthetic or traffic rationale has been set forth for the sign ban. If one had, then presumably signs in support of the embassy's government would be equally forbidden. *See Adderley v. Florida*, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966) (upholding content-neutral regulation of speech on jail premises). Nor is this a case like *Cox v. Louisiana*, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d

487 (1965), where the explicit constitutional value of preserving fair trials justified a viewpoint-neutral restriction that prohibited expression *designed to influence* judicial proceedings in the vicinity of a courthouse.

**12.** The Court has created an exception when the audience is schoolchildren. *Bethel School District*, — U.S. at —, 106 S.Ct. at 3164. Foreign emissaries are not, like America's youth, in need of civic training or special protection from sexually explicit speech. Neither does the Law of Nations constitute them as a class apart, entitled

Furthermore, there can be no clear-cut division between foreign and domestic political debate—limiting speech addressed to foreign embassies *will* inevitably affect the competition of ideas in the United States. Current anti-apartheid protests in front of the South African embassy are very much a part of the domestic political debate about appropriate United States responses to the South African regime.

The notion that the Law of Nations permits or requires silencing of Americans in their views on foreign governments' policies to avoid assault on the dignity of the embassy is too radical a departure from recognized first amendment principles to be accepted on the D.C. government's or the majority's say-so. If the protection of a foreign emissary's dignity is as compelling an interest as the majority believes, how can the ban on criticism be limited to an area within 500 feet of an embassy? Surely if the dignity interest is so compelling, and its compelling nature is evaluated under the majority's superdeferential standards, there is nothing to prevent suppression of insulting speech in many other forms and locations. These worrisome implications of the majority's dignity rationale make this truly a case about "the general suppression of entire categories of speech rather than merely preventing the offering of political insult within the immediate vicinity of a foreign embassy." Maj. op. at 1476.

Only if the District can show some interest that transcends the foreign government's sensitivity to insult in response to peaceful picketing would the first amendment allow suppression of political expression by American citizens. That interest could logically only be threats to the security of the embassy and its personnel or a threat of retaliation to our citizens and embassies abroad.

### III. CUSTOM TAILORING

In addition to showing that any content-based restriction on speech is supported by a compelling governmental interest, the government must also demonstrate that the restriction is not only narrowly tailored to achieve that interest, but is the least restrictive alternative available. *See supra* at 1479–80. The statute "in issue here is fatally overinclusive in some respects and fatally underinclusive in others." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 218, 95 S.Ct. 2268, 2277, 45 L.Ed.2d 125 (1975) (Douglas, J., concurring). The statute is overinclusive because no compelling interest in maintaining security has been shown to justify a prohibition on signs; it is underinclusive because a prohibition directed solely to anti-embassy speech cannot be justified when pro-embassy speech is likely to pose many of the same security risks. Moreover, even if the statute's viewpoint-discriminatory restriction were demonstrably related to the proffered security interests, the only constitutionally acceptable solution would be to create a viewpoint-neutral time, place, or manner restriction, *i.e.*, relegating both pro- and anti-foreign government viewpoints to a forum outside of the 500 foot zone.

### A. *Overinclusiveness*

As discussed in Section II, the only compelling interest that could justify the free speech restriction of this statute is security. However, while the second clause of the statute—the congregating prohibition—is readily recognizable as a security measure, there is no evidence whatsoever in the record to support on security grounds the restriction of the first clause, which allows demonstrators within 500 feet of the embassy provided that they do not hold signs that hold the embassy's government or officers up to "public odium" or "public disrepute."

The State Department affidavits assure us that "not all demonstrations are prohibited under section 22–1115. Vigils or protests which do not involve the use of placards or banners, and leafletting when the handout is not facially 'odious' are allowed so long as the demonstrators do not congregate within the '500 foot' pe-

to exercise a heckler's veto in violation of constitutional principles. *Cf. supra* at 1484 n. 7.

rimeter." *See* Affidavit of Deputy Chief John C. Connor, J.A. at 51 (discussing candlelight vigil that was deemed permissible); Defendants' Statement of Material Facts as to Which There is No Genuine Issue, point 7. Nothing in the record explains how or why this *restriction on certain kinds of signs* is related to the government's interest in maintaining embassy *security.* There is, for example, no claim, as there certainly was in *White House Vigil for ERA Committee v. Clark,* 746 F.2d 1518 (D.C.Cir.1984), that the sign restrictions are necessary to preserve visibility for security reasons or to prevent their use as weapons. *Id.* at 1532–34. The majority admits that "a law prohibiting a lone protester carrying a sign of any sort bears no relation to safeguarding the physical security of the building and its occupants. The only conceivable interest that would support such a restriction of speech is that of dignity and peace." Maj. op. at 1467.[13]

Since I do not believe that this statute can be upheld merely because it protects embassies from insult, the only constitutionally acceptable justification for upholding the controversial sign provisions of the statute is that countries offended by hostile demonstrators might turn face and refuse to protect our embassies or citizens abroad.[14] Indeed, the majority repeatedly hammers home this appalling spectre. Yet it is worth noting that none of the affida-

vits provided by the State Department and Secret Service representatives ever assert a direct link between our protecting foreign embassies from *insult* and the *security* of our foreign citizens abroad.[15] *See, e.g.,* Affidavit of James E. Nolan, Jr., Director of the Office of Foreign Missions, Department of State, J.A. at 47 ("what happens in terms of *security* provided to foreign diplomatic personnel and premises here has a direct impact on the protection afforded U.S. missions and personnel abroad") (emphasis added).

Thus, while the record before us supports to some degree the proposition that lessening the *security* of foreign embassies in this country might have adverse repercussions on our embassies abroad, there is not one word of evidence regarding what might happen if we allow marchers in front of the embassy to carry signs that hold the foreign government up to "public odium." Speculation could as easily run either way: that any reduction in the level of tranquility or good will around the embassy might lead to repercussions on our embassies abroad; or that given the government's contention that foreign governments closely scrutinize our policies regarding their embassies, and respond in an "eye for an eye" fashion, the only consequence that might ensue is that our own embassies would be subjected to "insult" signs by other countries' citizens.[16] The point is, of

---

**13.** The majority explains that

the *first part of the statute*—requiring a permit for the display of a sign tending to bring a foreign government into disrepute—*is primarily intended to avoid affronts to the dignity of foreign governments and their diplomatic personnel.* The second feature—prohibiting "congregating"—is concerned more with threats to the security of the foreign government's representatives and property.

Maj. op. at 1452 (emphasis added).

**14.** Even this justification raises serious constitutional questions. *See supra* at 1484 n. 7.

**15.** The majority attempts to overcome this evidentiary gap by pointing out that the affidavits mention the Vienna Convention, which codifies this country's obligation to protect both the security and dignity of embassies. Maj. op. at 1460. That treaty does not, however, provide evidence of a nexus between protecting embas-

sies from *insult* and avoiding retaliation abroad any more than it provides evidence of a link between *security* interests and retaliation. "Expert judgment" is equally necessary in both cases.

**16.** The major sponsor of the Senate Joint Resolution culminating in D.C.Code § 22-1115, did proffer at one point the explanation that the sign provision was designed to prevent the communication of ideas that threaten to

bring the hatred of people upon us whose embassy is thus besmirched.... [A]ll the armies that can be furnished will not protect our men and women in China and Japan if we arouse and incur the hatred not of those governments but of their people by speaking unkindly or in a manner to bring into odium their Governments and their people.

81 Cong.Rec. 8589 (comments of Sen. Pittman, Aug. 10, 1937). Thus, it is evident that part of

course, that mere speculation is not sufficient at least where there is no obvious relationship between the insult suffered from unsympathetic signs held in front of an embassy here and foreign governments' significant retaliation against our citizens abroad. If any disagreeable gesture to a foreign government is sure to turn into such retaliation, we are already endangering our nonresident citizens' lives by permitting embassy demonstrators at all, regardless of the presence or absence of signs. The silence of the record on this point belies any contention that there is a nexus between exposure to signs that disagree with a foreign government's policy and enhanced risk to Americans in that foreign country. Some affirmative evidence must surely be required to justify an explicitly content-based restriction on free speech.

The majority scrupulously fails to scrutinize the evidence actually submitted to the trial court to see whether it supports the D.C. government's claim that the sign provision is narrowly enough tailored to serve the compelling interests of national security. According to the majority, "[t]he four uncontradicted declarations submitted by defendants below indicate some of the special concerns justifying" D.C.Code § 22–1115. Maj. op. at 1460. Far from "indicat-

ing" "some" of the concerns, the affidavits constituted the *entire* evidentiary record which the District Court had before it in deciding whether summary judgment was appropriate, and not one word in any of them documents or even predicts adverse effects if we were to allow insulting signs in front of embassies. Elementary rules of civil procedure dictate that summary judgment should not have been granted in the absence of any evidence indicating that the ban on signs was necessary to protect embassy security at home or abroad.

We cannot uphold the statute simply because the government has sent its lawyers into court to defend it. It is our job to demand facts and evidence to show that the asserted justification really exists. As the Supreme Court has explained, a reviewing court's duty in first amendment cases is "to *make its own inquiry* into the imminence and magnitude of the danger said to flow from the particular utterance and then to balance the character of the evil, as well as its likelihood, against the need for free and unfettered expression." *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 843, 98 S.Ct. 1535, 1543, 56 L.Ed.2d 1 (1978). Virtually all first amendment cases involve "delicate" issues, and many implicate foreign relations. *See, e.g.,*

the statute's purpose, at least in its major sponsor's mind, was to protect the security of American citizens living abroad by diminishing the risk of incurring a foreign people's anger. *See also id.* at 8485 (comments of Senator Pittman, Aug. 7, 1937).

The opinion of a senator in 1937 that protecting foreign embassies from exposure to adverse signs was necessary to protect American nationals in foreign countries cannot, of course, be viewed as dispositive then, much less 50 years later. *See Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 843, 98 S.Ct. 1535, 1543, 56 L.Ed.2d 1 (1978) ("Deference to a legislative finding cannot limit judicial inquiry when First Amendment rights are at stake"). Unlike most duly-enacted laws which are presumed constitutional, the government bears the burden of proving the constitutionality of laws infringing on first amendment rights. *See generally Philadelphia Newspapers, Inc. v. Hepps*, —— U.S. ——, 106 S.Ct. 1558, 1564, 89 L.Ed.2d 783 (1986).

The fact is, however, that even Senator Pittman rejected the hypothesis that an affront to the dignity of the embassy might have *official*

repercussions. In response to a question as to whether the efforts of foreign governments to protect American nationals are dependent on the passage of the resolution, he responded that the foreign governments "no matter whether or not we protect them against insults and annoyance and possibly riot and physical injury, will do what they can to protect our citizens in their countries; but there is danger of physical injury when great and angry crowds meet in the way that has been referred to." 81 Cong.Rec. 8485 (remarks of Sen. Pittman, Aug. 7, 1937). It is thus apparent that the years have brought a shift in the governmental interest that is asserted to support the statute.

This shift in the interests that the statute serves is not, in and of itself, problematic. *See Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 71, 103 S.Ct. 2875, 2882, 77 L.Ed.2d 469 (1983) ("insufficiency of the original motivation does not diminish other interests that the restriction may now serve"). Such a change of interests served does, however, highlight the need for clear articulation and support for the current interests.

*New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (per curiam) (rejecting government's attempt to restrain publication of Pentagon Papers on national security grounds). Yet, none of these landmark first amendment cases suggests the hands-off approach that the majority now uses to justify virtual abdication of judicial responsibility to closely scrutinize first amendment abridgements of pure political speech. *See supra* at 1484 n. 8.

## B. *Underinclusiveness*

When the government makes a distinction based on the content of speech, it must demonstrate that this distinction is a close fit to its asserted interests. It is true that the Supreme Court

> frequently has upheld underinclusive classifications on the sound theory that a legislature may deal with one part of a problem without addressing all of it. *See, e.g., Williamson v. Lee Optical Co.,* 348 U.S. 483, 488–89, 75 S.Ct 461, 464–65, 99 L.Ed. 563 (1955). This presumption of statutory validity, however, has less force when a classification turns on the subject matter of expression. "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dept. of Chicago v. Mosley,* 408 U.S., at 95, 92 S.Ct. at 2289. Thus, "under the Equal Protection Clause, not to mention the First Amendment itself," *id.,* at 96, even a traffic regulation cannot discriminate unless there are clear reasons for the distinctions.

*Erznoznik v. City of Jacksonville,* 422 U.S. 205, 215, 95 S.Ct. 2268, 2275, 45 L.Ed.2d 125 (1975).

The Court's treatment of content-based distinctions, which in many ways resembles its treatment of disfavored classifications such as race under the equal protection clause, is based on the proposition that such classifications are inherently suspicious and even dangerous, in and of themselves. Thus, content-based distinctions re-

quire a far stronger showing of narrow tailoring than more neutral classifications. Even a cursory analysis of the nature and effect of content distinctions reveals why.

First, "when regulation is based on the content of speech, governmental action must be scrutinized more carefully to ensure that communication has not been prohibited 'merely because public officials disapprove the speaker's views.'" *Consolidated Edison Co. v. Public Service Commission,* 447 U.S. 530, 536, 100 S.Ct. 2326, 2332, 65 L.Ed.2d 319 (1980) (quoting *Niemotko v. Maryland,* 340 U.S. 268, 282, 71 S.Ct. 325, 333, 95 L.Ed. 267 (1951) (Frankfurter, J., concurring)). Especially when the "purported concern [is] to avoid controversy excited by particular groups," distinctions "may conceal a bias against the viewpoint advanced by the excluded speakers." *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.,* —— U.S. ——, 105 S.Ct. 3439, 3455, 87 L.Ed.2d 567 (1985).

Moreover, content-based restrictions and, to an even greater extent, viewpoint-based restrictions distort the marketplace of ideas by allowing only one side of the debate to speak at the chosen forum. "[B]ecause by effectively excising a specific message from public debate, they mutilate 'the thinking process of the community' and are thus incompatible with the central precepts of the First Amendment," such statutes are not tolerated save in the most exceptional circumstances. Stone, *Content Regulation and the First Amendment,* 25 Wm. & Mary L.Rev. 189, 198 (1983) (quoting A. Meiklejohn, *Political Freedom* 27 (1960)).

Given these special concerns, underinclusiveness is not so readily acceptable in laws embodying content-based distinctions. The fact that the law fails to address the entire problem "undercut[s] the asserted importance of the government interest said to support the restriction." *Id.* at 206; *see Carey v. Brown,* 447 U.S. 455, 465 & n. 9, 100 S.Ct 2286, 2292 n. 9, 65 L.Ed.2d 263 (1980) ("overinclusiveness and underinclusiveness of the statute's restriction ... un-

dermine [state's] claim that the prohibition ... can be justified by reference to the State's interest in maintaining domestic tranquility"). *See generally* Karst, *Equality As a Central Principle in the First Amendment*, 43 U.Chi.L.Rev. 20 (1975).

Examination of D.C.Code § 22–1115 and its purported security justifications reveals that it is indeed severely underinclusive. The statute prohibits demonstrations with signs that disapprove of the embassy government's position, but allows demonstrations with signs that support it. Yet, the government's own affidavit lends support to the view that violence can as easily erupt from an "initially peaceful" demonstration as from an openly hostile one. Affidavit of Thomas D. Quinn, Special Agent in Charge in the Office of Protective Operations of the United States Secret Service, J.A. at 42. No affidavit suggests that demonstrations including signs of one viewpoint are more prone to outbreaks of violence with the police or other members of the public. Thus, there is no ground in this record for the majority's conclusion that demonstrations expressing support for an embassy's position "simply do not threaten" the interests of the foreign government in avoiding violence and maintaining its dignity. Maj. op. at 1474–75. Imagine demonstrators carrying signs in front of the South African Embassy announcing, "We Support Apartheid." Surely they would engender as much potential for violence and indignity as signs reading, "We Condemn Apartheid." Would a 1939 Nazi demonstration in front of the German Embassy with signs praising the Third Reich threaten the peace less than demonstrators decrying that regime? [17]

Moreover, even if documented, the argument that pro-embassy views are less dangerous than anti-embassy ones has no constitutional acceptability. It was soundly rejected in *Mosley*, where the city argued that "although it permits peaceful labor picketing, it may prohibit all nonlabor picketing because, as a class, nonlabor picketing is more prone to produce violence than labor picketing." 408 U.S. at 100, 92 S.Ct. at 2292. The Supreme Court disagreed, and instead laid down the rule that:

> Predictions about imminent disruption from picketing involve judgments appropriately made on an individualized basis, not by means of broad classifications, especially those based on subject matter. Freedom of expression, and its intersection with the guarantee of equal protection would rest on a soft foundation indeed if government could distinguish among picketers on such a wholesale and categorical basis. "[I]n our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Tinker v. Des Moines School District*, 393 U.S. 503 at 508, 89 S.Ct. 733 at 737, 21 L.Ed.3d 731.

*Mosley*, 408 U.S. at 100–01, 92 S.Ct. at 2292–93. Similarly here, the mere prediction that anti-government demonstrations are likely to create more of a security threat than pro-government demonstrations is simply too broad a proposition to justify a classification on the basis of viewpoint like the one enshrined in § 22–1115.

C. *Neutrality As the Least Restrictive Alternative*

Finally, and most fundamentally, the statute could not pass constitutional scrutiny even if the fit between the content-based classification and the government's asserted compelling interest in security were neat or even if one accepted the majority's tenuous "dignity" justification. The Supreme Court's first amendment decisions instruct that the government has a duty, when it adopts a content-based restriction on speech, to show that it is the least restrictive means possible to accomplish a compelling interest. *See supra* at 1479–80. That showing cannot be made

---

**17.** Although these examples are clear-cut, the kind of ideological line-drawing by government officials that may be necessary in some cases to decide which signs are supportive and which are critical of foreign governments is an additional constitutional problem in implementing the statute.

here where a valid content-neutral time, place, or manner restriction is an available alternative to the viewpoint-based restriction.

The majority concludes that the content distinction is justified anyway because the alternative of prohibiting both viewpoints within 500 feet of the embassy will restrict even more speech. This conclusion wholly ignores the "equality principle" that the Supreme Court has recognized in first amendment jurisprudence. The Court has on several occasions subordinated the first amendment interest in total aggregate speech to the first amendment interest in maintaining equality among speakers and, more importantly, viewpoints.

### 1. The "Greater" Power Does Not Necessarily Include the Lesser

There is more to the constitutional guarantee of free speech than quantitative measuring, *i.e.,* simply ensuring that the most people are allowed to say the most words possible. The Supreme Court has indicated that the Constitution tolerates, and may even require, some *broader* restrictions on speech in order to avoid the evil of narrower content-based classifications. For example, in *Schacht v. United States,* 398 U.S. 58, 90 S.Ct. 1555, 26 L.Ed.2d 44 (1970), the Court struck down a provision of a federal statute that authorized an actor to wear a military uniform while portraying a serviceman in a theatre or motion picture so long as "the portrayal does not tend to discredit that armed force." *Id.* 398 U.S. at 59–60, 90 S.Ct. at 1557. Acknowledging that a *broad* prohibition on wearing "our military uniforms without authority is, standing alone, a valid statute," *id.* at 61, the Court nonetheless held that the *narrower* prohibition violated the first amendment, because it discriminated in favor of and against particular viewpoints.

Similarly, in *Police Department v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972), and in *Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972), the Court struck down statutes incorporating content distinctions even though broader, content-neutral restrictions on picketing would apparently have passed muster. Again, in *Carey v. Brown,* 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980), the Court struck down an Illinois statute that barred all picketing of residences except for "the peaceful picketing of a place of employment involved in a labor dispute." *Id.* 447 U.S. at 457, 100 S.Ct. at 2288. The Court stressed that it should not be

> understood to imply, however, that residential picketing is beyond the reach of uniform and nondiscriminatory regulation.... " 'The crucial question, however, is whether [the Illinois statute] advances that objective in a manner consistent with the command of the Equal Protection Clause.' *Reed v. Reed,* 404 U.S. [71], 76, [, 92 S.Ct. 251, 254, 30 L.Ed.2d 225] [ (1971) ]." *Police Department of Chicago v. Mosley,* 408 U.S., at 99, 92 S.Ct. at 2292. And because the statute discriminates among pickets based on the subject matter of their expression, the answer must be "No."

*Id.* 447 U.S. at 470–71, 100 S.Ct. at 2295–96. *See also Erznoznik v. City of Jacksonville,* 422 U.S. 205, 215 n. 13, 95 S.Ct. 2268, 2276 n. 13, 45 L.Ed.2d 125 (1975) (indicating that "narrowly drawn nondiscriminatory traffic regulation" would be upheld even though *more* narrowly drawn discriminatory regulation was invalid).

This theme is consistent with the principle that the "constitutional guarantee of free speech 'serves significant societal interests' wholly apart from the speaker's interest in self-expression." *Pacific Gas & Electric Company v. Public Utilities Commission,* — U.S. —, 106 S.Ct. 903, 907, 89 L.Ed.2d 1 (1986). As Justice Brennan has explained, "[t]he First Amendment embodies more than a commitment to free expression and communicative interchange for their own sakes; it has a *structural* role to play in securing and fostering our republican system of self-government." *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 587, 100 S.Ct. 2814, 2833, 65 L.Ed.2d 973 (1980) (Brennan, J., concur-

ring). It thus borders on the frivolous to suggest that the first amendment, or its "narrowly tailored" component, can · be meaningfully applied by comparing the number of syllables that are uttered regardless of their content or the extent to which the government is providing an optimal forum to one side only of a political debate. In the words of a leading commentator, "the first amendment is concerned, not only with the extent to which a law reduces the total quantity of communication, but also—and perhaps even more fundamentally—with the extent to which the law distorts the public debate." Stone, *supra* p. 29, at 198. Once these core values are taken into account, it is not at all "odd to describe an alternative that restricts" more words, but preserves equality, as less restrictive of first amendment freedoms. *See* maj. op. at 1465.

### 2. *Viewpoint Discrimination and the Available Alternatives*

The dangers of content discriminatory speech limitations are at their zenith when the discrimination is based not on the type of subject matter in general but on the particular viewpoint of the speaker. *See* Stephan, *The First Amendment and Content Discrimination*, 68 Va.L.Rev. 203, 233 (1982). Contrary to the majority's suggestion,[18] the Supreme Court has

> *never held* that government may allow discussion of a subject and then discriminate among viewpoints on that particular topic, even if the government may entirely exclude discussion of the subject from the forum. In this context, the greater power does not include the lesser because for First Amendment purposes exercise of the lesser power is more threat-

ening to core values. Viewpoint discrimination is censorship in its purest form and government regulation that discriminates among viewpoints threatens the continued vitality of "free speech."

*Perry Education Association v. Perry Local Educators' Association*, 460 U.S. 37, 61–62, 103 S.Ct. 948, 963–64, 74 L.Ed.2d 794 (1983) (Brennan, J., dissenting) (emphasis added). Indeed, in *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976), the plurality, while suggesting the legitimacy of some content-based distinctions, was careful to point out that *viewpoint* discrimination was not involved in the case. *Id.* 427 U.S. at 67–68, 96 S.Ct. at 2450–51.

The driving concept of the first amendment to promote a marketplace of ideas is twisted out of shape when, through governmental action, only one side of the debate is permitted access to the premium selling booth. While the Constitution does not guarantee speakers the best possible media exposure, *see Heffron v. International Society for Krishna Consciousness*, 452 U.S. 640, 647, 101 S.Ct. 2559, 2563, 69 L.Ed.2d 298 (1981), it does guarantee competitors *equal access* to such exposure. Above all else, the first amendment "forbids government to interfere with the competition of ideas." *Georges v. Carney*, 691 F.2d 297, 300 (7th Cir.1982). The viewpoint distinction in D.C.Code § 22–1115 violates this core principle with a vengeance.

D.C.Code § 22–1115 is obviously a viewpoint-based regulation. A picketer's access to the 500 foot zone turns exclusively on whether his signs applaud or condemn the government of the embassy. Yet the majority suggests that because the statute applies equally to those who wish to protest against the East German and the West German embassies, it does not illegitimate-

---

**18.** The majority suggests that, in one case, the Supreme Court has tolerated viewpoint-based regulation of speech. *See* maj. op. at 1469 (citing *Parker v. Levy*, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974)). Nothing in *Parker* supports this proposition. First, although the statute was arguably viewpoint-based, Parker did not challenge that aspect of it before the Court. Moreover, even if we attribute relevance to the Court's silence on that issue, we cannot ignore the Court's repeated admonitions that its ruling

in *Parker* was unique to the military context. The Court stressed that "'[i]n the armed forces some restrictions exist for reasons that have no counterpart in the civilian community.... Speech that is protected in the civilian population may nonetheless undermine the effectiveness of response to command. If it does, it is constitutionally unprotected.'" *Id.* at 758–59, 94 S.Ct. at 2562–63 (quoting *United States v. Priest*, 45 C.F.R. 338, 344 (1972)).

ly discriminate among viewpoints. Maj. op. at 1475. The majority's argument is silly. Issues and controversies do not divide themselves neatly along national lines like paired legislative votes. The statute does engage in viewpoint discrimination when anyone who wishes to disagree with any country's policy is banned from picketing at that country's embassy, while those supporting it are welcomed. Indeed, the legislative history reveals no small amount of intolerance for groups who choose to demonstrate against other countries' policies.[19]

It is still not clear whether the heightened special fears associated with viewpoint-based regulation mean that our Constitution will *never* tolerate regulation based on the speaker's viewpoint.[20] In *Carey v. Brown*, 447 U.S. 455, 465, 100 S.Ct. 2286, 2292, 65 L.Ed.2d 263 (1980), however, the Court did explain that it "might agree that certain state interests may be so compelling *that where no adequate alternatives exist* a content-based distinction—if narrowly drawn—would be a permissible way of furthering those objectives" (emphasis added). We need not resolve the ultimate issue in this case.[21] It is enough that an obvious and constitutionally acceptable alternative is available here, *i.e.*, a viewpoint-neutral restriction on *all* demonstrating in the vicinity of an embassy. The existence of this obvious alternative serves to further condemn the viewpoint discriminatory § 22–1115.

I can think of few scenarios more antithetical to first amendment values than one involving two groups—one pro-foreign government, one anti-government—simultaneously approaching an embassy with

---

**19.** Discussing the protests that he received about the statute, Senator Pittman stated:

> Whence come these protests against the joint resolution? Have we heard the American Legion appealing to us ...? Have we heard the Veterans of Foreign Wars appealing to us ...? Have we heard the Daughters of the American Revolution protesting that by the enactment of this resolution we are destroying constitutional rights?
>
> . . . . .
>
> No! Telegrams are coming to us, but who are they from? Some day before our committee we will find out who is sending them....

81 Cong.Rec. 8590 (remarks of Sen. Pittman, August 10, 1937).

**20.** *Schacht v. United States* is one of the only modern Supreme Court decisions dealing with a viewpoint-discriminatory statute. After wearing an army uniform in a street skit protesting American involvement in the Vietnam war, Schacht had been convicted of violating 18 U.S.C. § 702, which forbids unauthorized wearing of the uniform of the armed forces of the United States. Schacht defended himself on the basis of 10 U.S.C. § 772(f), which provided that "[w]hile portraying a member of the Army, Navy, Air Force, or Marine Corps, an actor in a theatrical or motion-picture production may wear the uniform of that armed force *if the portrayal does not tend to discredit that armed force.*" (emphasis added). After explaining that a blanket prohibition on unauthorized wearing of a uniform would be valid, 398 U.S. at 61, 90 S.Ct. at 1558, the Court nonetheless struck down the conviction, holding that:

> In the present case Schacht was free to participate in any skit at the demonstration that

praised the Army, but ... he could be convicted of a federal offense if his portrayal attacked the Army instead of praising it.... Clearly punishment for this reason would be an unconstitutional abridgment of freedom of speech. The final clause of § 772(f), which leaves Americans free to praise the war in Vietnam but can send persons like Schacht to prison for opposing it, cannot survive in a country which has the First Amendment. To preserve the constitutionality of § 772(f) that final clause must be stricken from the section.

*Id.* at 63, 90 S.Ct. at 1559. Significantly, the Court never looked to any potential justifications or compelling interests that might lie behind the distinction. On the other hand, language in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), might be read to support the theory that some viewpoint discriminatory statutes could pass muster, at least in the school setting. *See id.* 393 U.S. at 511, 89 S.Ct. at 739 ("the prohibition of expression of one particular opinion, at least without evidence that it is necessary to avoid material and substantial interference with schoolwork or discipline, is not constitutionally permissible"). *But see Bethel School District No. 403 v. Fraser*, ── U.S. ──, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986) (different first amendment standards apply in the school setting).

**21.** Because of the existence of an alternative to viewpoint discrimination in this case, I need not decide this issue. What the majority terms as ambivalence, maj. op. at 1469 n. 14, I prefer to think of as adherence to the long-standing principle of deciding constitutional issues as narrowly as the case allows.

signs. The policemen's task under § 22–1115 is to discern the viewpoint of each speaker and allow one group to pass the 500 foot barrier while forcing the other group to stay behind it. Those barred from the forum are not only deprived of access, but are also forced to watch their competitors take over the forum for their exclusive use. How much less odious to first amendment freedoms and values if *all* embassy demonstrators were forced to respect the 500 foot limit? [22]

Thus, I do not believe that D.C.Code § 22–1115 is the least restrictive method of dealing with the interests that the government has proffered, even if these interests are legitimate and compelling ones. A viewpoint-neutral regulation prohibiting *all* embassy-related sign holding in the 500 foot zone around the embassy would provide greater protection from the dangers to both dignity and security than the current regulation does,[23] would remove the problem of viewpoint discrimination, and would

---

**22.** The majority argues that my approach is inconsistent with the Supreme Court's decision in *Cox v. Louisiana*, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965), and this court's unpublished order in *Jackalone v. Andrus*, No. 79–2359 (D.C. Cir. Nov. 19, 1979). Maj. op. at 1466. The majority misconstrues the import of those decisions, and exaggerates the scope of my approach. *Cox* was decided in 1965, well before the Supreme Court developed its special rules for dealing with content-based restrictions. In any event, the statute there, while arguably content-based, was clearly not viewpoint-based and thus did not implicate the same concerns as the one here.

As for *Jackalone*, I find it troublesome that the majority ignores the Circuit Rule which, as the majority concedes, provides that unpublished orders are not citable as precedents. Maj. op. at 1466. *See also Western Union Telegraph Co. v. FCC*, 773 F.2d 375, 377 n. 1 (D.C.Cir.1985) (admonishing counsel not to cite unpublished orders) (per Scalia, J., with Mikva, J., and Bork, J., concurring). While the majority seems to assume that a case is not cited "as precedent" unless it controls the decision, traditionally a case is used as precedent whenever it is "considered as furnishing *an example* or authority for an identical or similar case afterwards arising." *Black's Law Dictionary* 1059 (5th ed. 1979) (emphasis added). The majority clearly relies on *Jackalone* for its quality as precedent, and Rule 8(f) itself indicates that unpublished cases are only to be cited for purposes such as *res judicata* "which turn on the binding effect of the judgment, and not on its quality as precedent." Under the dictionary definition of precedent and the history of circuit practice under Rule 8(f) there is no support whatsoever for the majority's use of *Jackalone* in its decision.

In any case, the fact that the order in *Jackalone* was all of three sentences and set out no background facts renders it useless even as an instructive guide. If, as the briefs tend to indicate, *Jackalone* merely held that the government rightfully denied a permit since, in view of the hostage crisis, there was "a clear and present danger to the public safety, good order, or

health," *see* 36 C.F.R. § 50.19(d)(2), there is no inconsistency. Such a regulation would be clearly content-neutral. Although the majority asserts that the regulation in *Jackalone* was actually applied based on the content and viewpoint of the speech, maj. op. at 1466 n. 12, the government's brief in *Jackalone* denies this. Brief for Federal Appellants at 11. If the Park Service had promulgated a permanent regulation banning all anti-Iranian demonstrations in the park, I certainly would argue that a viewpoint-neutral regulation should have been substituted. We, of course, have no idea from the order if the court in *Jackalone* even considered the "content" issue, which makes it even more farfetched to suggest that *Jackalone* represents the judgment of a panel of this court on any issue before us.

The majority's failure to recognize the differing impacts of content-based and viewpoint-based regulation is again evidenced by its own hypothetical which asks whether "a locality that wished to prohibit the shouting of 'Fire!' in a crowded theatre" should not "be constitutionally required to outlaw the shouting of 'Encore' as well." Maj. op. at 1475. The majority misses the point that the fire/encore distinction is a content-based one, while § 22–1115 is viewpoint-based. Building on the analogy, § 22–1115 is equivalent to telling the audience they may yell encore, but may not boo at the end of a performance that they dislike.

**23.** Such a ban might be upheld solely on the basis of the important governmental interest in protecting embassy security. *Cf. CISPES v. FBI*, 770 F.2d at 468, 472–75 (5th Cir.1985); *Concerned Jewish Youth v. McGuire*, 621 F.2d 471 (2d Cir.1980), *cert. denied*, 450 U.S. 913, 101 S.Ct. 1352, 67 L.Ed.2d 337 (1981). The fit between a total ban and the security interest would be tighter than that between § 22–1115 and the security interst, which is not narrowly served by a content- and viewpoint-based restriction. Such a statute would still provide more protection than the general embassy statute, 18 U.S.C. § 112, discussed *supra* at 1485. This extra protection might, depending on the

provide an equally accessible forum for all speakers outside of the 500 foot zone.[24]

Everyone agrees that embassies deserve to be protected against genuine dangers to their security, even if that means total prohibitions against demonstrations within close range. What we do not agree on is whether dignity interests can rise to a level compelling enough to justify protecting embassies by using a ban on free speech that discriminates in an arbitrary and unnecessary way between those who may demonstrate in front of embassies and those who may not. Certainly a fair and rational law which embodies no such discrimination could not be perceived in any foreign quarter as a lesser protection for foreign representatives, warranting retaliatory action against Americans living in their country.

## IV. STANDARDLESS DISCRETION

The second clause of § 22–1115 makes it unlawful "to congregate within 500 feet of any such building or premises, and refuse to disperse after having been ordered so to

do by the police authorities of the said District." D.C.Code § 22–1115. In short, congregation (provided that there are no signs) anywhere within 500 feet of the embassy—up to the very gates—is permissible, *unless the police decide* it is not, and order the crowd to disperse.

Undoubtedly the District may grant authority to its police to disperse crowds and preserve the public peace under certain circumstances. *See Cox v. Louisiana*, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965). But in describing that authority, the Supreme Court has been careful to point out that it must be "appropriate, limited discretion, under properly drawn statutes or ordinances." *Id.* at 558, 85 S.Ct. at 466. For example, in the area of licensing, the Court has declared that "a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." *Shuttlesworth v.*

factual showings made, be reasonable in light of the peculiar security concerns in the District of Columbia, such as those the government discussed in its affidavits.

It is also possible that a content-neutral ban could be upheld, at least in part, based on the government's asserted "dignity" interest. Although I have concluded that dignity does not rise to the level of a compelling interest so as to justify the content-based restrictions of § 22–1115, it might qualify as a "significant" enough interest to justify a content-neutral ban. Contrary to the majority's suggestion, maj. op. at 1466–67, there is no inconsistency in this position unless one sees fit to ignore two decades of Supreme Court precedent establishing dramatically different levels of scrutiny for content-based and content-neutral regulation of speech. *See supra* at 1479.

**24.** This is not to say that this balance would be the same in each and every case involving content-based distinctions. For example, where the goal of neutrality would require broad, outright prohibitions on otherwise protected speech, that might not be considered an acceptable alternative. *See* Redish, *The Content Distinction in First Amendment Analysis*, 34 Stan.L.Rev. 113, 136–37 (1981); Comment, *Equal But Inadequate Protection: A Look at* Mosley *and* Grayned, 8 Harv.C.R.–C.L.L.Rev. 469, 476 (1973). Similarly, even if one assumes that the Court treated the statute in *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310

(1976), as a traditional content-based distinction, *but see supra* note 5, any content-neutral statute there would have required forcing all theatres to move to the outskirts of the city. This is far different from establishing a 500 foot neutral zone. Moreover, since the objective in *Young* was to segregate the adult theatres, requiring all theatres to be in a single area would hardly have accomplished the goal. Finally, as the court in *Young* stressed, that statute did not involve viewpoint discrimination. *See Young,* 427 U.S. at 67–68, 96 S.Ct. at 2450–51.

In this case, by contrast, a blanket bar against protests in the 500 foot zone would leave opportunities for expression elsewhere, as required of a content-neutral time, place, and manner regulation. *See Heffron v. International Society for Krishna Consciousness,* 452 U.S. 640, 654, 101 S.Ct. 2559, 2567, 69 L.Ed.2d 298 (1981) (discussing requirement of adequate alternative forum). As the majority repeatedly points out, closing off a 500–foot zone around embassies is a limited impingement on speech, if applied across-the-board. The majority's analysis is, of course, totally inapposite to the statute at hand, which involves a content-based restriction. The availability of a forum 500 feet away is only relevant when a content-neutral statute is involved, since the Court has "consistently rejected the suggestion that a government may justify a content-based prohibition by showing that speakers have alternative means of expression." *Consolidated Edison Company,* 447 U.S. at 541 n. 10, 100 S.Ct. at 2335 n. 10.

*City of Birmingham,* 394 U.S. 147, 150–51, 89 S.Ct. 935, 938–39, 22 L.Ed.2d 162 (1969). Similarly, the Supreme Court has insisted that the "legislature establish minimal guidelines to govern law enforcement" officials in the exercise of their discretion. *Kolender v. Lawson,* 461 U.S. 352, 358, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983) (quoting *Smith v. Goguen,* 415 U.S. 566, 574, 94 S.Ct. 1242, 1247, 39 L.Ed.2d 605 (1974)). Standards are, ironically, deemed essential in other cases to avoid the very possibility, ensconced in the statute here, of public officials' taking the speaker's content and viewpoint into account in determining whether to license, or in this case, disperse, a gathering. *See generally Secretary of State v. Joseph H. Munson Co.,* 467 U.S. 947, 964 n. 12, 104 S.Ct. 2839, 2851 n. 12, 81 L.Ed.2d 786 (1984); *Village of Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 628–32, 100 S.Ct. 826, 831–34, 63 L.Ed.2d 73 (1980); *Hynes v. Mayor of Oradell,* 425 U.S. 610, 620, 96 S.Ct. 1755, 1760, 48 L.Ed.2d 243 (1976); *Staub v. City of Baxley,* 355 U.S. 313, 321–25, 78 S.Ct. 277, 281–84, 2 L.Ed.2d 302 (1958); *Lovell v. City of Griffin,* 303 U.S. 444, 451–53, 58 S.Ct. 666, 668–69, 82 L.Ed. 949 (1938).

But § 22–1115 provides no guidance at all as to when the police should and should not disperse a "congregating" group. In *Zaimi v. United States,* 476 F.2d 511, 515 (D.C.Cir.1973), this court explained that the second section of the statute, *i.e.,* the congregating provision, is "functionally" separate from the first part, dealing with signs. This court clearly held that the portion of the ordinance prohibiting congregating was not qualified by the first portion of the ordinance. *Id.* at 527. Thus the majority cannot, consistent with circuit precedent, save this portion of the ordinance from facial invalidity by interpreting the ordinance to allow the police to order dispersal only when they "reasonably believe that a threat to the security or peace of the embassy is present." Maj. op. at 1472.[25] While the majority by judicial fiat reads into the second part of the ordinance an overriding purpose of protecting the dignity of the embassy, maj. op. at 1472 & n. 17, that purpose is nowhere to be found in the language of that part of the ordinance. In addition, only a narrowing interpretation by a state court or legislature can be relied upon to qualify a potentially standardless restriction on speech so as to overcome a constitutional challenge. *Gooding v. Wilson,* 405 U.S. 518, 520, 92 S.Ct. 1103, 1105, 31 L.Ed.2d 408 (1972); *Hill v. City of Houston, Texas,* 764 F.2d 1156, 1164–65 (5th Cir.1985).

This statute is thus very different from the majority's example, D.C.Code § 22–1121(2), which this court upheld in *Washington Mobilization Committee v. Cullinane,* 566 F.2d 107 (D.C.Cir.1977). *See* maj. op. at 1471. On its face, § 22–1121(2) penalizes one who "with intent to provoke a breach of the peace, or under circumstances such that a breach of the peace may be occasioned thereby—(2) congregates with others on a public street and refuses to move on when ordered by the police." The

**25.** In *Frend v. United States,* 100 F.2d 691 (D.C. Cir.1938), *cert. denied,* 306 U.S. 640, 59 S.Ct. 488, 83 L.Ed. 1040 (1939), the court interpreted the permit provision of the statute's first clause in a manner that avoids this difficulty. The clause makes it unlawful to display the listed items within 500 feet of the listed buildings "except by, and in accordance with, a permit issued by the Chief of Police of the said District." Nonetheless, the court amazingly concluded that the statute

[b]y its terms ... makes it a misdemeanor to do the prohibited things, and the provision authorizing the Superintendent of Police to issue a permit must be read as authorizing its issuance subject to the prohibitions of the

resolution. That is to say, that only in those cases in which its use will not harass or bring into public odium the representatives of foreign governments, does power to issue exist. *Id.* at 694. This reading of the statute, is, of course, nonsensical. Only those who wish to engage in what is enumerated in the statute need to seek permits, yet, according to *Frend* permits may not be issued to anyone who intends to do that which is enumerated. Nonetheless, that portion of *Frend* does represent the law of the circuit until overruled by the full circuit or by the Supreme Court. Undoubtedly taking this into account, plaintiffs have not challenged the licensing scheme of the statute's first clause.

ordinance had, however, been interpreted by this court earlier, acting as a local court (before the present D.C. local court system was created), to apply only to conduct which constitutes a nuisance or creates a substantial risk of provoking violence. *Id.* at 116. Relying on this narrowing construction of the phrase "breach of the peace," we found that the ordinance was constitutional. *Id.* at 116–17.[26] But, as I have explained, *Mobilization Committee's* limiting technique is not available with respect to § 22–1115. *See supra* at 1471–72.

Our disposition of this issue is controlled by this court's decision in *United States v. Abney,* 534 F.2d 984 (D.C.Cir.1976) (per curiam), where we struck down the conviction of a protestor who, while protesting in Lafayette Park, violated a regulation which provided that "[s]leeping, loitering or camping with intent to remain for a period of more than four hours in any park area, is prohibited, *except upon proper authorization of the Superintendent." Id.* at 985 (emphasis added). The court held that

> [t]he regulation gives the Superintendent authority to grant permission to sleep in the park beyond the time limit specified, but it contains no "narrow, objective, and definite standards to guide the licensing authority" [citing *Shuttlesworth* ] to guard against the danger of arbitrary action or *de facto* censorship of certain points of view. If the *Shuttlesworth* standard of "public welfare, peace, safety, health, decency, good order, morals, or convenience" is facially unconstitutional, the totally unfettered discretion granted to the Superintendent here cannot survive constitutional challenge.

*Id.* at 985–86. These principles apply equally to the totally unfettered discretion given to the police in § 22–1115. *See Cox v. Louisiana,* 379 U.S. 559, 573, 85 S.Ct.

476, 485, 13 L.Ed.2d 487 (1965); *Association of Community Organizations for Reform Now v. Municipality of Golden, Colorado,* 744 F.2d 739, 747 (10th Cir.1984).

Some sense of the amazing breadth of discretion accorded police to disperse congregations by § 22–1115 can be gleaned by comparing it to other statutes recently declared invalid by the courts. In *Beckerman v. City of Tupelo, Mississippi,* 664 F.2d 502 (5th Cir.1981), for example, the court invalidated a parade ordinance which authorized the chief of police to deny a permit upon finding that "the conduct of the parade will probably cause injury to persons or property or provoke disorderly conduct or create a disturbance." *Id.* at 507. The court held that the term "provoke disorderly conduct" was susceptible of a broad interpretation, which would allow the chief of police "to deny permits to those seeking to engage in protected activity," *id.* at 508, and explained that:

> No narrowing construction has been offered by the Tupelo City Council or the Mississippi courts. Because we do not sit as a "super" state legislature, we may not impose our own narrowing construction onto the ordinance.... We fully recognize the fact that Tupelo enacted the ordinance in good faith and intends to apply it in a fair manner. We cannot, however, overlook the substantial potential for overbroad application of the ordinance.

*Id.* at 509. *See also Association of Community Organizations for Reform Now v. Municipality of Golden, Colorado,* 744 F.2d 739 (10th Cir.1984); *Cinevision Corp. v. City of Burbank,* 745 F.2d 560, 571 (9th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 2115, 85 L.Ed.2d 480 (1985).

The majority tries to avoid the confrontation with these recent precedents[27], first

---

26. The D.C. police line regulation, also cited by the majority and upheld by this court, specified five emergency situations in which police could set up an exclusionary zone and order people away. Because the regulation specified which specific situations triggered its use, and did so without "rely[ing] on subjective terms to define

proscribed conduct," 566 F.2d at 117–18, it was also found to be constitutional.

27. The local District of Columbia courts have recognized the applicability of this doctrine in dealing with similar D.C. statutes in "sensitive" areas. In *United States v. Nicholson,* Nos. 20210–69A, et al. (D.C.Ct. of Gen.Sess. June 19,

by feebly attempting to distinguish *Shuttlesworth* and *Abney*. *See* Maj. op. at 1470–71. Even if these were the only cases on point, the distinction that the majority draws between permits in general and "sensitive areas," maj. op. at 1471, would be illogical. There is nothing about "sensitive areas" that makes it impossible to carefully draft a statute delineating the standards by which the police are to exercise their authority to disperse congregating groups.

The majority also suggests that "a court would [not] sustain a conviction *under this statute* for refusal to disperse upon a policeman's order if the policeman had acted out of personal malice [or] to prevent the sidewalk sale of neckties." Maj. op. at 1471–72. That answer, however, ignores the longstanding first amendment doctrine that "[p]roof of an abuse of power in the particular case has never been deemed a requisite for attack on the constitutionality of a statute purporting to license the dissemination of ideas." *Thornhill v. Alabama,* 310 U.S. 88, 97, 60 S.Ct. 736, 741, 84 L.Ed. 1093 (1940); *see also Hynes v. Mayor of Oradell,* 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976); *Staub v. City of Baxley,* 355 U.S. 313, 78 S.Ct. 277, 2 L.Ed.2d 302 (1958); *Lovell v. Griffin,* 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938).

But the fact is that this is not even a case where a speaker is attempting to challenge a licensing scheme without having asked for and been denied a license. The plaintiffs here alleged that on multiple occasions the police used this standardless statute to prevent them, on penalty of arrest, from peacefully congregating. That is clearly enough for a facial attack on the statute, and I simply do not understand how the court can principledly avoid it. The dispersion portion of the law is patently void for lack of any governing criteria.

## V. CONCLUSION

The majority opinion, by blindly deferring to the political branches and unquestioningly accepting their assertion of an ill-defined interest in protecting foreign emissaries from annoyance and insult, effectively gouges out an enormously important category of political speech from first amendment protection. The fact that *some* regulation of speech is needed to serve a compelling interest in preserving security, and the fact that *some* deference is due to coordinate branches, does not, however, mean that the court has no role in assuring that the regulatory scheme is fine-tuned in accordance with constitutional principles. If the court were to accept its mandate and invalidate this statute, Congress could easily draft an alternative that would be just as protective of security, but far less abhorrent to the first amendment.

The majority attempts to ignore well-settled constitutional principles by emphasizing what it perceives to be the trivial nature of the restrictions at issue here. *See, e.g.,* maj. op. at 1476–77. But what may seem trivial to the majority is obviously not so trivial to those who brought this suit, nor to those anti-apartheid protestors whose arrests in front of the South African embassy we followed on the front pages and on the evening news for over a year; they have risked and suffered arrest in

---

1969), *aff'd,* 263 A.2d 56 (D.C.1970), Chief Judge, now District Court Judge, Harold H. Greene held that policemen in the United States Capital could not constitutionally use a standardless unlawful entry on property statute to order the defendants to leave the Capitol. *See Dellums v. Powell,* 566 F.2d 167, 178–79 (D.C.Cir.1977) (discussing *Nicholson* ). The *Nicholson* court then turned to D.C.Code § 9–113 which forbids anyone to "parade, stand, or move in processions or assemblages in said United States Capitol Grounds, or to display therein any flag, banner, or device designed or adapted to bring into public notice any party, organization, or move-

ment" except with the permission of the Speaker of the House and the President of the Senate, or in their absence from Washington, the Capitol Police Board. *See* D.C.Code §§ 9–124, 9–125. The court held that this vesting of standardless discretion violated the principle that "in a government of laws, the regulation of conduct—particularly conduct in the sensitive area covered by the First Amendment—must be predicated on a set of definite rules, *not on the opinions of police officers." See Dellums,* 566 F.2d at 200 (reproduction of *Nicholson* decision) (emphasis added).

order to gain access to what they perceive to be the most effective forum in which to express their convictions.[28] There is, so far, no constitutional principle setting out hybrid rules of scrutiny for "trivial" viewpoint regulation of free speech.

Given the passage of a half century since § 22–1115 was enacted, and the dramatic developments in our first amendment jurisprudence during these five decades, I hope that Congress will revisit this statute and show it has the constitutional sense to do what this court will not.

I respectfully dissent.

---

**28.** Under the majority's "trivial question doctrine" many of the Supreme Court's important first amendment decisions might never have been delivered since there were undoubtedly alternative forums for communication and the thinking processes of the community were not noticeably mutilated. *See, e.g., United States v.* *Grace,* 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983) (invalidating restrictions within vicinity of Supreme Court building); *Police Department v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) (invalidating content-based restriction within 150 feet of school).